THE STATE ex rel. CAPITAL CITY WATER COMPANY, Appellant, v. PUBLIC SERVICE COMMISSION OF MISSOURI.

In Banc, May 22, 1923.

1. **PUBLIC SERVICE COMMISSION**: Legislative Agent: Fixing Rates: Judicial Review.   The power of the Public Service Commission to fix maximum rates is a legislative power; but the power to determine whether the rates so fixed are consonant with constitutional limitations is a judicial power.   The courts have power to review orders fixing rates made by the commission alleged to be confiscatory or unreasonably unjust; and while they will not prescribe rates, for that is legislative, they will determine whether a prescribed rate is subversive of a constitutional right. *Held*, by JAMES T. BLAIR, J., dissenting, that said ruling is

State ex rel. Water Co. v. Public Serv. Commission.

based upon an approval of State ex rel. Bell Telephone Co. v. Public Serv. Commission, 233 S. W. 436 et seq., and other cases which are contrary to the rule in practically all other jurisdictions, contravene the statute and are in conflict with the Missouri Constitution.

2. **RATES: Historical Costs: Deficits: Capitalization.** Early losses of a public utility cannot be capitalized as "historical cost of a going concern" in arriving at its present base value for the purpose of determining whether rates fixed by the Public Service Commission are confiscatory. The company cannot erect out of past deficits in operation a legal basis for a holding that rates for future operation would be confiscatory, which on the basis of present reproduction value would be compensatory.

3. ————: ————: ————: **Based on Right to Eight Per Cent.** Deficits which are such only because the utility company has assumed it was in all preceding years entitled to earn eight per cent return upon plant-cost cannot be considered deficits, even if deficits could be considered as capital upon which a return should be paid. But past losses in operation cannot be capitalized, and are of no consequence in arriving at the historical value of the plant.

4. ————: **Cost of Reproduction: Overhead Cost.** In calculating the reproduction cost of a public utility new, overhead charges vary; in some cases they are large, in others moderate and often they depend upon eventualities unforeseen at the inception of the enterprise. In this case the evidence does not establish that the overhead allowances by the Public Service Commission were too low.

5. ————: ————: **Depreciation: Sinking-Fund and Straight-Line Method.** In an attempt to ascertain the cost of reproduction new of a waterworks system which had been established for nearly thirty years and enlarged and improved from time to time, and the amount to be deducted for depreciation, the Public Service Commission employed neither the sinking-fund method, which implies a determination of the life-expectancy of a machine or unit and the creating of a sinking fund, into which is annually paid an amount which, with the increment of interest from year to year, will be sufficient to replace the unit at the end of its useful life, nor the straight-line method, which is to estimate the life of a machine or unit and deduct from its value such proportion thereof as its age bears to its estimated life-expectancy; but, having ascertained the reproduction cost, the commission, after considering and weighing both methods, by personal examination of the property concluded that it was in eighty-eight per cent condition, and deducted twelve per cent for depreciation; and it is *Held*, without determining whether the straight-line method is appropriate to

526    SUPREME COURT OF MISSOURI.

State ex rel. Water Co. v. Public Serv. Commission.

only short-life and inexpensive plants, or whether for valuable plants and long-life units the sinking-fund method should be employed, that the evidence fails to show that the amount deducted by the commission for depreciation was too large.

6. ———: ———: **Brokerage.** In ascertaining reproduction value, hypothetical broker's fees are not allowable.

7. ———: ———: **Going Value: No Evidence: Included in Purchase: Good Will** Since going value is defined as the value, distinct from good will, inhering in a plant whose business is established as distinguished from one which must be established, or as the added value of the plant as a whole over the sum of the values of its component parts which attaches to the plant because it is in active and successful operation and earning a dividend, it cannot be ruled that the Public Service Commission erroneously excluded it in arriving at the reproduction cost, where there was no satisfactory evidence to show what such going value was; and since the commission, in arriving at reproduction cost, took into consideration the recent adequate and full purchase price, including the business, franchises and good will, as well as all tangible units of the plant, and there is no evidence showing that since said purchase the going value has materially increased, it must be ruled that the going value was included, though not separately found; and particularly so, where the company, in presenting its case, confuses going value and good will, since good will is not to be considered in valuations for the purpose of rate-making.

8. ———: **Reasonable Value of Plant.** The Public Service Commission, in determining the reasonable value of a waterworks system, considered its historical cost, the investment cost to the present owners, its reproduction cost less depreciation, the fact that the plant was a going concern in successful operation, and included working capital and all other elements of value, tangible or intangible, used by the company in serving the public. *Held,* that the rule employed was correct.

9. ———: **Estoppel: Warning.** Since estoppel is not urged, it is not ruled that appellant has estopped itself from complaining of the value placed upon its property by the Public Service Commission; but warning is given of a possible disapproval of the practice that would permit a public utility to petition the commission to fix rates upon the basis of a valuation previously announced as just, and when the rates are established, if unsatisfactory, accept them under protest, and, while using them, attack in the courts both the base valuation and the rates.

Vol. 298]          APRIL TERM, 1923.                527

State ex rel. Water Co. v. Public Serv. Commission.

10. ——: **Reasonable Return: Guide.** The Public Service Commission, in determining what is a reasonable return in any given case, is not bound by any hard-and-fast rule, but the question is one calling for the exercise of common sense and sound judgment. It does not follow that rates sufficient to yield a return of seven per cent on the investment and one and a half per cent for depreciation when fixed, but a slightly less sum in a subsequent test year, would be confiscatory; particularly so, where the increased rates fixed for the subsequent test period were tentative, and a recession in the cost of production due to abnormal conditions might reasonably have been expected, and a higher rate would have resulted in a less number of users and diminished consumption.

11. ——: **Confiscatory: Six Per Cent Net: Unearned Salary.** Rates for a waterworks plant, which yield a net income of six per cent on the investment, in addition to one per cent for depreciation, shown to be a reasonable allowance for depreciation, are not confiscatory; particularly so, where the rates are fixed only for a test period, and are therefore temporary and tentative, and the evidence establishes that a salary of $2,000 is being paid to the company's vice-president and general manager, who lives in a distant state and rarely visited the plant.

12. ——: **Amortization of Deficits.** There is no warrant in the law for the capitalization of past losses in operation, or for their inclusion in future operating expenses, for the purpose of determining future rates.

13. ——: **Past Earnings.** Low past earnings should not incite the establishment of exorbitant future rates, nor influence a holding of rates otherwise reasonable to be confiscatory for the future.

14. **MOOT CASE: Appeal from Judgment Affirming Rates.** Where the circuit court affirmed the order of the Public Service Commission fixing certain utility rates for a period of thirteen months and retaining jurisdiction of the subject-matter, in order, at the end of that test period, now expired, that the company might apply for a modification of said rates, and the company appealed without bond, the rates being in force meantime, an adjudication that the rates so fixed were confiscatory and a reversal of the judgment would be of no avail to appellant, since the court has no power to fix a different rate, but can only affirm or reverse the judgment of the circuit court.

Appeal from Cole Circuit Court.—*Hon. John G. Slate, Judge.*

AFFIRMED.

*Irwin & Haley, I. R. Kelso, Sparrow & Patterson* and *John M. Atkinson* for appellant.

(1) The valuation finding was at least $100,000 less than the fair present value of the company's property on January 1, 1917. It was grossly inadequate and unreasonable, and is not supported by the oral evidence and exhibits. The action of the Commission, in fixing a value so low, and in basing rates thereon, was arbitrary and unjust, and results in the taking of the company's property without due process of law and without just compensation, in violation of the State and Federal Constitutions. (a) The evidence offered by the company established these three measures of value: Reproduction new, less depreciation, as to which the preponderance of testimony supported the value found by Chester & Fleming, $475,958; Actual book or historical cost, corroborated, remains undisputed by any testimony whatsoever, $476,561; Investment cost, which is merely a matter of computation, $409,996. The value fixed by the commission was $360,000. (b) The values placed on the various tracts of land and buildings by the commission's engineer was shown to be ridiculously low by the testimony of Jefferson City real estate men and bankers, who placed values five times greater on certain of the tracts. (c) The prices used for construction estimates by the company on clear well and settling basins were supported by the testimony of contractors who had done similar work amounting to millions of dollars. (d) The company's proof of the value of boilers, pumping machinery and smoke stack consisted of catalog and contract prices, cost of erection as shown by the books, and testimony of builders and erectors of similar machinery. The commission finding was supported by the testimony of one of its engineers who admitted that he had never constructed or superintended the construction of a water plant. (e) Ten competent witnesses having experience in excavation and pipe-laying work in Jefferson City supported the company's estimate of the cost

of mains installed. The testimony of one witness, only, supported the commission's finding. (f) The company's claim for overhead costs is in accordance with percentage allowances by the commission in other water plant valuations. The commission's allowance was an arbitrary and wholly unreasonable reduction from percentage allowances established by it in other cases. (g) The company frequently carries large amounts of unpaid bills for water furnished State institutions at Jefferson City. The city is now, and has been for many years, indebted to the company. Despite these unusual conditions which require a large working capital, the commission allowed a working capital of only $7,000, less than that allowed other plants, fairly comparable. (h) No specific allowance for going value was included by the commission. The Supreme Court of the United States has repeatedly held that it is an element of value and must be given consideration. In subsequent cases, the commission has expressly allowed substantial sums for going value. City of Joplin v. Home Telephone Company, 4 Mo. P. S. C. R. 64; Des Moines Gas Company v. City of Des Moines, 238 U. S. 165, 199 Fed. 204; Denver v. Union Water Company, 246 U. S. 178; Cedar Rapids Gas Company v. Cedar Rapids, 223 U. S. 655; Kings County Lighting Co. v. Willcox, 210 N. N. 479; Pioneer Telephone & Telegraph Co. v. Westenhaver, 29 Okla. 447; Fort Scott Gas & Electric Co. v. Fort Scott, P. U. R. 1915 B. 481; Omaha v. Omaha Water Co., 218 U. S. 180; Detroit Telephone Company Rate Case, P. U. R. 1918 C. 81; Knoxville v. Knoxville Water Company, 212 U. S. 1; Galena Water Company v. Galena, 87 Pac. 735; Fruit Belt Telephone Co., 18 C. L. 906; Passaic Gas Company Case, 15 C. L. 354; Valparaiso City Water Co. v. Valparaiso, 69 N. E. 1018; In re Kansas, Clay County & St. J. R. Co., 8 Mo. P. S. C. 682. (2) The rate of return of seven per cent allowed does not permit the company to earn a profit equal to profits in other branches of industry. The ability of the company to secure capital for needed extensions is destroyed. That rates of interest have kept pace with

the increased costs and increased value of property of all kinds is a matter of common and universal knowledge. (a) Rates fixed by the State, a commission, or a municipality to govern the charges of a public service company must be reasonable, and the question of reasonableness or unreasonableness is one for the determination of the courts. If the rates fixed are unreasonable they deprive the company of its property without just compensation and therefore without due process of law. Chicago, M. & St. P. Railway Co. v. Minnesota, 134 U. S. 418; Wadley Southern Railway Co. v. Georgia, 235 U. S. 651; Stone v. Farmers Loan & Trust Co., 154 U. S. 326; San Diego Land & Town Co. v. National City, 174 U. S. 739. (b) A rate which does not yield sufficient net return to the public utility to attract and invite the necessary capital to provide funds for the natural expansion of such utility, cannot be held to be reasonable and lawful. Home Telephone Company v. Carthage, 235 Mo. 644, 666; Lincoln Gas & Electric Co. v. Lincoln, 250 U. S. 258; Omaha & C. B. Street Ry. Co. v. Railroad Commission, 173 N. W. 690, P. U. R. 1919 F. 307; Butler v. Lewiston Street Ry. Co., P. U. R. 1916 D. 25, 46; Commission v. Providence Gas Company, P. U. R. 1919 B. 531; Re Sumpter Valley R. Co., P. U. R. 1918 C. 659; Re Philadelphia Electric Co., P. U. R. 1918 C. 659; Briggs v. Peaks Island Corp., P. U. R. 1917 E. 750, 761; Re Springfield Consol. Water Company, P. U. R. 1918 E. 358; Re San Joaquin L. & P. Corp., P. U. R. 1918 F. 662; Re Rates of Telephone Companies, P. U. R. 1920 B. 411. (c) The risks of loss in the utility business are today very great. Some measure of considerate, if not liberal, treatment should be extended to investors venturesome enough to assume such risks. Re Tri City R. Co., P. U. R. 1919 E. 836; Re Georgia R. & P. Co., P. U. R. 1918 F. 624. (d) It is necessary, under the present high costs of obtaining money, to permit utility corporations to sell their securities at rates of interest and discount netting more than eight per cent to the investor. Good faith, if not legal obligation, requires that the State protect these investors by prescrib-

ing rates which will enable the corporations to pay the rates of interest applicable to their securities and provide a fund for the making up of the discount when the securities mature.  Re United R. & Electric Co., P. U. R. 1920 A. 1.   (3) Even though it be determined that· the valuation as fixed and determined by the Commission was adequate and the rate of return of seven per cent was just and reasonable, yet the uncontroverted evidence in this case shows that the company incurred large deficits each year, under the rates which the commission compelled it to charge.  (a) The commission fixed the value of the property at $360,000.   Subsequent extensions brought this value up to $379,380.  It prescribed a rate of return of seven per cent after payment of operating expenses and depreciation reserve.  (b) It has compelled the company to charge rates which produced a return much lower than seven per cent.  (c) The fact of the inadequacy of the return has been conceded by the commission in its written reports, but it refused to allow an increase of rates.

*R. P. Spencer* and *James D. Lindsay* for respondent.

(1) The order of the commission reaches this court with the presumption of right action upon the part of the commission and as prima-facie valid.   It has the weight of chancellor's judgment.  State ex rel. Wabash v. Public Service Com., 271 Mo. 166; Lusk v. Atkinson, 268 Mo. 109.  (a) On appeal in a chancery case, the findings of a·chancellor on the facts will not be disturbed, unless clearly erroneous.  New England Loan & Trust Co. v. Browne, 177 Mo. 423; Troll v. Real Estate Co., 186 Mo. App. 206.  (b) Conclusions of fact of the trial court, in an equity case, where there is a sharp conflict in the testimony of witnesses, will usually be respected.  Price v. Rausche, 186 S. W. 968; Holman v. Holman, 183 S. W. 623.  (c) The findings of a chancellor on conflicting evidence will not be disturbed.  Walker v. Wallis, 186 S. W. 1041.  (d) Even where the findings of the chancellor

532 SUPREME COURT OF MISSOURI.

State ex rel. Water Co. v. Public Serv. Commission.

are slightly against the weight of the evidence, they will not be disturbed on appeal except for plain error. Hunnell v. Zinn, 184 S. W. 1154. (e) Administrative orders made by a utility commission fixing rates are legislative in their nature. Louisville & Nashville Railroad Co. v. Garret, 231 U. S. 313; Grand Trunk Railway v. Indiana Railroad Commission, 221 U. S. 403; Wadley Southern Railroad Co. v. Georgia, 235 U. S. 660; State ex rel. Sedalia v. Public Service Com., 275 Mo. 208. (f) The judiciary may not exercise any power properly belonging to the legislative department of Government. Mo. Constitution, art. 3. (g) In so far as the last clause of Section III of the Public Service Act, attempts to give power to this court to make a finding on the facts set forth in the record and to substitute its judgment on such facts for the judgment of the commission, it is to that extent in conflict with Article III of the Constitution and is void. Bacon v. Rutland Railroad Co., 232 U. S. 134; State v. Great Northern Railroad Co., 130 Minn. 57; Detroit & Mackinac Ry. v. Mich. Railroad Co., 235 U. S. 402; Interstate Commerce Com. v. Ill. C. Railroad Co., 215 U. S. 470. (h) Sections 123 and 124 of the Public Service Act are not in conflict with Article III of the Constitution and are in accord with the other provisions of the act and with the trend of judicial opinion and should be given full force and effect by this court. State ex rel. v. Public Service Commission, 271 Mo. 159. (i) It is presumed that the rates fixed by the State are reasonable and just. The burden of proving them otherwise is upon the appellant. Nor. Pac. Ry. v. North Dakota, 236 U. S. 604; Cincinnati Ry. v. Interstate Commerce Commission, 206 U. S. 154; Interstate Com. Comm. v. Union Pacific Railroad, 222 U. S. 546; Vandalia Railway v. Schnull, P. U. R. 1919 C. 647; Louisiana Railroad Comm. v. Cumberland Tel. Com., 212 U. S. 414; New York & Queens Gas Co. v. McCall, 245 U. S. 345. As to what is a reasonable return or rate is a question of fact, the solution of which calls for the exercise of sound judgment and common sense by the rate-making body. Duluth

Street Railway Co. v. Railroad Com., 161 Wis. 245; State Public Utilities Com. v. Springfield Gas & E. Co., 125 N. E. 896. Courts have neither the authority nor the inclination to substitute their judgment as to what is a reasonable rate for that of the commission, nor will they do so although the rate upon which the commission acted may have been insufficient, so long as the rates adopted were not based entirely upon arbitrary conjecture.. Cumberland Tel. & Tel. Co. v. Railroad Com. 156 Fed. 823; Railroad Com. v. Cumberland T. & T. Co., 212 U. S. 414. (4) While items of going concern are elements that should be considered in determining the value of a plant and specific sums under these heads have been allowed, it has nowhere been held to be incumbent on a commission to fix separately these items. Des Moines Gas Co. v. Des Moines, 238 U. S. 165; Denver v. Denver Union Water Co., 246 U. S. 178; Cedar Rapids Gas Co. v. Cedar Rapids, 223 U. S. 655; Kings Co. Lighting Co. v. Willcox, 210 N. Y. 479; Pioneer Tel. & Tel. Co. v. Westenhaver, 29 Okla. 447; Omaha v. Omaha Water Co., 218 U. S. 180. (5) In a case such as this, where the property has changed hands, the investment cost to the present owners is a fair basis of valuation. (6) A rate that yields a net return of 5.9 per cent, after allowing for taxes and one and one-half per cent for depreciation, at a time when the price of labor and material is at its pinnacle, may not be said to be confiscatory. Wilcox v. Consolidated Gas Co., 212 U. S. 49; Denver v. Denver Water Co., 246 U. S. 194; Lincoln Gas Co. v. Lincoln, 250 U. S. 267.

GUY A. THOMPSON, Special Judge.—This is an appeal from the Circuit Court of Cole County, the purpose of which is to have this court review the action of the Missouri Public Service Commission in prescribing maximum water rates.

The history of this litigation, as well as of appellant company, will be noticed presently in sufficient detail. Suffice it at this point to observe that appellant owns and operates the waterworks at Jefferson City, Missouri,

which supply with water the city, the State Penitentiary and the Missouri Pacific Railroad at that place. On January 2, 1917, appellant made application to the Public Service Commission for an increase in the rates charged its water consumers. Such proceedings followed that the commission fixed $360,000 as the value of appellant's plant as at January 1, 1917, and ultimately on October 30, 1919, fixed $379,380.65 as its value as of April 1, 1919, taking into account the fact that the plant was in successful operation as a going concern with an established business, and prescribed certain rates for the period from November 1, 1919, to November 30, 1920.

Appellant thereupon executed and filed with the commission a stipulation accepting these rates "under protest" pending action upon its application for a rehearing. At the same time it filed its motion for a rehearing, which, on March 6, 1920, the commission overruled. Thereupon appellant sued out *certiorari* in the Circuit Court of Cole County. Seasonable return having been made and the cause duly heard, that court, on September 28, 1920, entered judgment approving the orders of the Public Service Commission. Motions for a new trial and in arrest having been filed and overruled the case was brought here by appeal.

It is urged by appellant, Capital City Water Company, that the value placed upon its property, and the maximum rates prescribed by the Public Service Commission by its aforesaid orders of October 30, 1919 and March 6, 1920, are unjust and confiscatory, and result in the taking of its property without due process of law, in violation of Section 30, Article II, of the Constitution of Missouri, and of Section 1 of the Fourteenth Amendment of the Constitution of the United States. All matters of controversy, therefore, may be disposed of in connection with the consideration of the two main questions, namely: Was the value which the commission placed upon appellant's property unreasonable, unjust or confiscatory? Were the rates which the commission fixed unjust or confiscatory?

I.   Preliminary to our consideration of these main questions, however, attention should be given to the contention vigorously insisted upon by learned counsel for the Public Service Commission, namely:   That unless it appears from the record that the commission acted arbitrarily or through mere caprice and without any substantial evidence to support it, this court has no constitutional power to review the commission's findings.   The argument is that the Public Service Commission is an administrative board, and its orders fixing values are legislative in their nature; that Article III of the Constitution of Missouri forbids the judiciary from exercising powers belonging to the legislative department; that, therefore, if Section 10522, Revised Statutes 1919, providing that upon review of the commission's orders the case shall be tried as a suit in equity, intends to give this court authority to set aside the findings and orders of the Public Service Commission as to values and rates which are not absolutely arbitrary, it is unconstitutional and void.

*Judicial Review.*

This argument has been pressed upon this court, before but without avail, and we decline to yield to it now. The power to fix maximum rates may be, and doubtless is, a legislative power; the power to determine whether the rates so fixed are consonant with constitutional limitations is a judicial power.   The legislative branch can no more deprive the judicial of the exercise of the latter power than the judicial branch can deprive the legislative of the exercise of the former.   In other words, while the judiciary cannot prescribe what rates may be, it can, and when an action is properly brought before it should, determine whether a prescribed rate has been constitutionally fixed.

We had occasion recently to consider this very question in State ex rel. v. Public Serv. Commission, 233 S. W. 430, and concerning it said:

"What we are concerned in is the reasonableness, within the meaning of the law, of the rates established by the commission, in the determination of which no bet-

ter formula can be prescribed than that given by the Supreme Court of the United States in Interstate Com. Com. v. Union Pacific Railway Co., 222 U. S. l. c. 547, 32 Sup. Ct. 108, 56 L. Ed. 308, in which it is said, in effect, that the reasonableness of an order of a rate-making body, regular upon its face and such as is here involved, may be questioned if: (1) The rates are so low as to be confiscatory and hence inimical to the constitutional pro- vision against taking property without due process of law; or (2) that the rates were fixed arbitrarily and un justly without regard to the preponderance of the compe- tent evidence; or (3) that they were fixed in such an un reasonable manner as to cause the shadow, and not the substance, to determine the validity of the exercise of the power.

"The fact that the Interstate Commerce Commission is clothed with certain judicial powers not possessed by the Public Service Commission does not render inap- plicable here the succinct rules above stated in deter- mining the reasonableness of the rates in question. Both the national and the state commissions are, in the main, administrative bodies, and their orders are to be so classi- fied in the fixing of rates. When, therefore, their acts in this regard are called in question, the courts are re- quired, as in the review of equitable proceedings, to hear and determine the matter involved in such a manner as to do full and complete justice in the premises. [State ex rel. Wabash Ry. Co. v. Pub. Serv. Comm., 271 Mo. 155, 196 S. W. 369; A. T. & S. F. Ry. Co. v. Pub. Serv. Com., 192 S. W. (Mo.) 460; Lusk v. Atkinson, 268 Mo. 109, 186 S. W. 703; Int. Com. Comm. v. Ill. Cent., 215 U. S. l. c. 470, 30 Sup. Ct. 155, 54 L. Ed. 280; Int. Com. Comm. v. Nor. Pacific, 216 U. S. l. c. 554, 30 Sup. Ct. 417, 54 L. Ed. 608; Int. Com. Comm. v. Ala. Mid. Ry., 168 U. S. 144, 18 Sup. Ct. 45, 42 L. Ed. 414; Van Dyke v. Geary, 244 U. S. 39, 37 Sup. Ct. 483, 61 L. Ed. 973; Penn. Ry. Co. v. Towers, 245 U. S. 6, 38 Sup. Ct. 2, 62 L. Ed. 117, L. R. A. 1918C, 475.] The question involved is one of fact; the ultimate matter to be determined is, Did the commission act within its powers as above defined?"

In this connection see also State ex rel. St. Joseph L. & P. Co. v. Public Service Commission, 272 Mo. 645; State ex rel. M. K. & T. Railroad v. Public Service Commission, 277 Mo. 193; State ex rel. City of Harrisonville v. Public Service Commission, 236 S. W. 852; and State ex rel. v. Public Service Commission, 235 S. W. 131, l. c. 133. [See also Knoxville v. Knoxville Water Company, 212 U. S. 1, 8; Wadley Southern Ry. Co. v. Georgia, 235 U. S. 651, l. c. 660; San Diego Land Co. v. National City, 174 U. S. 753; Reagan v. Farmers' Loan and Trust Company, 154 U. S. 399.]

II.   We pass, therefore, to the consideration of the above stated two main questions in the case, bearing in mind that, though the findings and orders under review are the deliberate actions of a body specially fitted by learning and experience to deal with these matters and are prima-facie lawful and reasonable (R. S. 1919, secs. 10533, 10534), nevertheless, if, upon a view of the entire record as in the review of an equity proceeding, we shall conclude either that (1) the rates are so low as to be confiscatory, or (2) were fixed arbitrarily and unjustly without regard to the preponderance of the competent evidence, or (3) were fixed in such an unreasonable manner as to cause the shadow and not the substance to determine the validity of the exercise of the commission's power, we shall so hold.   Otherwise, the judgment of the lower court will be affirmed.

III.   *As to the value placed by the commission upon the property of the appellant.*   Upon this branch of the case the question for the commission's determination was, What sum would reasonably represent the fair present value of appellant's property devoted to the public use?

Jefferson City is a city of the third class, with a population of 13,500.   Its water system was constructed in 1888 by a construction company composed of the stockholders of the Jefferson City Water Works Company, to which the plant was transferred upon its completion.

538     SUPREME COURT OF MISSOURI.

State ex rel. Water Co. v. Public Serv. Commission.

The building committee reported the cost of the system in 1888 to be $149,560. The Jefferson City Water Works Company operated the system until July, 1912, when it was sold to appellant, the Capital City Water Company, of whose authorized capital stock of $400,000, $200,000 had been issued and was owned, one-third by its vice-president, J. N. Chester of Pittsburgh, Pennsylvania, and two-thirds by its president, W. H. Donner of Philadelphia, Pennsylvania. The purchase price was $160,-000 cash, paid for stock, and the assumption of a mortgage of $135,000. Since, however, cash on hand and its equivalent, aggregating $21,390, went with the plant, the total purchase price should be considered to be $273,610. Extensions and improvements were added from time to time, the amount of which will be noticed later. Appellant is now operating under a franchise granted by the city of Jefferson City for a period of twenty years from June 1, 1908, and from the time of the purchase in 1912, until the hearing before the commission in 1917, appellant charged the rates prescribed in its franchise. Appellant has twenty-three miles of water mains, approximately nineteen hundred consumers, and its water pumpage for the year 1916 was 462,924,305 gallons, and for 1918 was 499,434,651 gallons.

IV. Upon appellant's aforesaid application for an increase in rates there was a hearing broad in scope and exhaustive in detail. The evidence was directed toward disclosing (a) the historical cost of the property; (b) its investment cost to the present company (appellant), and (c) its reproduction cost new less depreciation, all as of January 1, 1917.

(a) HISTORICAL COST. Concerning the historical cost it is conceded that the total capital expenditures upon the plant up to December 31, 1916, according to expense book, check stubs, check registers and vouchers were $341,045.40, and, according to annual reports submitted by the superintendent, $347,762.88. From either of those figures should be deducted items representing the value of abandoned and superseded property, aggre-

gating $9180. Therefore, the commission found the historical cost of the property then in use to be not in excess of $338,582.88, *without deducting anything on account of depreciation.*

Appellant will have no criticism of this finding if the so-called "early losses" cannot be capitalized to represent what one of its witnesses called the "historical cost of the going value." The "going value," as that term is used by appellant in this connection, should be understood to mean the cost of developing the waterworks system to its then condition of efficiency—the cost of developing its organization and the income which it then enjoyed. It is argued that past deficits represent the cost of establishing this so-called "going value" of the company, and hence constitute a part of the historical cost of the plant. To determine the amount of such deficit appellant, it says, figured that it was entitled to nine per cent annually upon the cost of the plant at each year for return and depreciation. The sum of the differences each year between this amount and the actual surpluses realized represented the total "deficit" or "historical cost of going value." Later during the hearing the "deficit" was reduced to an eight per cent basis, thereby lowering the so-called "historical cost of the going value" to $128,798.16. This is said to be the Wisconsin method.

In determining the historical value of the plant the commission declined to allow this or any sum as the "historical cost of the going value."

In the case of Galveston Electric Company v. Galveston, 43 Sup. Ct. Rep. 351, it was sought by the same method to have a large sum considered as representing the "going concern value," and that court said, at page 354:

"The fact that a utility may reach financial success only in time or not at all, is a reason for allowing a liberal return on the money invested in the enterprise; but it does not make past losses an element to be considered in deciding what the base value is and whether the rate

is confiscatory. A company which has failed to secure from year to year sufficient earnings to keep the investment unimpaired and to pay a fair return, whether its failure was the result of imprudence in engaging in the enterprise, or of errors in management, or of omission to exact proper prices for its output, cannot erect out of past deficits a legal basis for holding confiscatory for the future, rates which would, on the basis of present reproduction value, otherwise be conpensatory. [Knoxville v. Knoxville Water Co., 212 U. S. 1, 14, 53 L. Ed. 371, 380, 29 Sup. Ct. Rep. 148.]

"Nor is there evidence in the record to justify the master's finding that a business brought to successful operation 'should have a going concern value at least equal to one-third of its physical properties.' Past losses obviously do not tend to prove present values. The fact that a sometime-losing business becomes profitable eventually, through growth of the community or more efficient management, tends to prove merely that the adventure was not wholly misconceived. It is doubtless true, as the master indicated, that a prospective purchaser of the Galveston system would be willing to pay more for it with a record of annual losses overcome, than he would if the losses had continued. But would not the property be, at least as valuable if the past had presented a record of continuous successes? And shall the base value be deemed less in law if there was no development cost, because success was instant and continuous? Or, if the success had been so great that, besides paying an annual return at the rate of eight per cent, a large surplus had been accumulated, could the city insist that the base value be reduced by the amount of the surplus? Compare Newton v. Consolidated Gas Co. decided March 6, 1922, 42 Sup. Ct. Rep. 264. . . . Going concern value and development cost, in the sense in which the master used these terms, are not to be included in the base value for the purpose of determining whether a return is confiscatory."

We are in entire accord with this reasoning. As stated by the commission in the present case: "If it

were possible to capitalize losses the most unsuccessful property would have the greatest going value, thereby creating an illegal and absurd basis for rate making.''

V.  Furthermore, these past deficits (so-called) are deficits only because appellant has chosen to assume that it and its predecessor owner were at all times entitled to earn eight per cent upon plant cost, whereas, of course, the law had prescribed no such rate of return.

VI.  In our judgment the Public Service Commission of Missouri, in determining reasonable maximum rates, has no authority under the law to consider past losses of this character as capital upon which a return should be paid.  Since, therefore, these ''past losses'' cannot be capitalized, they are of no consequence in considering the historical value of the plant; and we agree with the commission that the historical cost of appellant's property in use January 1, 1917, exclusive of depreciation, did not exceed $338,582.88.

VII.  (b) INVESTMENT COST OF PRESENT OWNER. Appellant bought the plant in July, 1912, paying therefor $135,000 (for stock), and assuming the payment of bonds aggregating $160,000, and since the purchase (to January 1, 1917) made capital expenditures aggregating $85,271. It contended that there should be added the sum of $23,-725 on account of ''interest deficit'' accruing since the purchase, and $6,000 ''salary deficit'' for two years to its president and vice-president.

VIII.  The commission, in our opinion, properly refused to include these two items last mentioned, for they represented alleged past losses, and hence should not have been capitalized for the purpose of fixing the rates.

IX.  With the plant were purchased and taken over the cash on hand and bills receivable amounting to $21,-390.  This, of course, should be deducted from the purchase price.  Accordingly the commission found the investment cost to the present owner, as of January 1, 1917, exclusive of depreciation, to be as follows:

Purchase price of plant, .............$295,000.00
Less cash on hand and bills receivable, .. 21,390.00

Purchase price, ...................$273,610.00
Add subsequent capital expenditures, ... 85,271.00

Total investment cost to Jan. 1, 1917, ...$358,881.00

And we approve that finding.

X. (c) COST OF PRODUCTION NEW LESS DEPRECIATION. Appellant submitted a detailed inventory and appraisement of its property prepared by the firm of Chester & Fleming, hydraulic and sanitary engineers of high standing and large experience of Pittsburgh, Pennsylvania. Oral evidence in substantiation of the appraisal was also offered. Using the same inventory the commission's engineer, Mr. S. R. Morrow, also appraised the property and testified at the hearing. The purpose of both appraisals was to advise the commission of the cost of reproducing the property without and with depreciation deducted. The engineers in their appraisals, and the witnesses in their testimony concerning values, disclaimed giving abnormal war values, but affirmed that they were stating the average values over a period of five years last past. Appellant's appraisement and testimony were to the effect that the cost of reproduction new of the physical property, including overhead expenses and $10,000 for working capital was $434,709. From this it deducted, as representing depreciation value of depreciable items, $32,651, leaving at the cost of reproduction new less depreciation, $402,058. To this appellant contended there should be added a five per cent "brokerage charge" of $21,735 and $52,165 for "going value." Thus the account as presented by appellant's appraisal and testimony may be stated as follows:

Cost of reproduction new .......'......... $434,709.00
Deduct depreciation, ....................32,651.00

Reproduction new less depreciation, ...... $402,058.00
Add five percent for brokerage, ........ 21,735.00

Vol. 298] ·     APRIL TERM, 1923.     543

State ex rel. Water Co. v. Public Serv. Commission

Add Going Value, ................... 52,165.00

Total cost of reproduction new less
depreciation, .................$475,958.00

On the other hand, Mr. Morrow gave as the repro-
duction cost new $338,581 as against appellant's figures
of $434,709 for the same items. Mr. Morrow deducted
$75,535 for depreciation, leaving as his final figure to
represent his estimate of the cost of reproduction new
less depreciation as of January 1, 1917, the sum of
$263,046, as against appellant's $402,058.

After a very careful and analytical review of the
testimony the commission approved Morrow's appraisal,
except that it held the amount deducted by Morrow for
depreciation was too much, and that increases aggregat-
ing $17,000 should be made on account of the stand pipe
tract, mains and meters. Adding this item to Morrow's
total of $338,581 as representing the reproduction cost
new, including $7,000 for working capital and excluding
depreciation the amount is $355,581, as contrasted with
appellant's $434,709 for the same items.

The commission thought that the amount deducted
by Morrow for depreciation was too great. Upon per-
sonal examination of the property, and considering all
of the evidence, the commission was of the opinion that
the property was in eighty-eight per cent condition, and,
therefore, that there should be deducted on account of
accrued depreciation of the depreciable items twelve
per cent thereof, or a total of $38,026, leaving as rep-
resenting the commission's judgment of the cost to
reproduce the property in its then condition (January
1, 1917), including $7000 for working capital, and de-
ducting accrued depreciation, $317,565, as against ap-
pellant's $402,058 for the same items. Since the Com-
mission allowed $7000 as against appellant's $10,000 for
working capital, the difference between the commission
and appellant, without taking any account of brokerage,
or of going value, is $81,503. The commission disallowed
appellant's item of $21,735 brokerage and, as we shall

presently see, refused to assess "going value" as a separate thing, though in reaching finally its conclusion as to plant value, took in consideration the fact that it was a going concern in successful operation.

As found by the commission, the account representing the cost of reproduction new, less depreciation, as of January 1, 1917, may be stated as follows:

| | |
|---|---|
| Cost of reproduction new, ............. | $355,581.00 |
| Deduct depreciation (twelve per cent of depreciable items), .............. | 38,026.00 |
| Cost of reproduction new less depreciation, ........................... | $317,555.00 |

XI. The evidence as to reconstruction costs was parol and rested chiefly upon the experience and judgment of the witnesses. As is usual in such cases, there was considerable divergence of opinion. We have critically examined and deliberately weighed all of the voluminous evidence, including the exhibits, in this case. The conclusions of the commission find substantial support in the record, and we are convinced that the commission's figures representing the cost of reproduction new less depreciation, should be approved, unless the commission erred in allowing too little for overhead cost, or for working capital, or in deducting too much for depreciation, or in not allowing the aforesaid items of brokerage and going value claimed by appellant. To these we will now give attention.

XII. OVERHEAD. It is conceded that overhead charges vary and are, in large part, matters of judgment. Sometimes they are quite large; sometimes quite moderate, and often they depend upon eventualities quite unforeseen at the inception of the enterprise. The amounts allowed by the commission for overhead were, as to the land: interest during the construction, six per cent; taxes during the construction, one per cent; contingencies, including survey, etc., two per cent; legal expenses, one per cent; making a total of ten per cent. [Consult in this connection the Minnesota Rate Case, 230 U. S.

455.] The other overhead allowances included interest on the entire amount for half the period of construction (one year), three per cent; taxes and insurance during the construction, including liability insurance, two per cent; contingencies, two per cent; legal expenses, one per cent; engineering, five per cent; a total of thirteen per cent. Appellant claimed that an aggregate of seventeen or eighteen per cent (exclusive of the real estate) should be allowed. The short assumed period of construction (one year) has, of course, held the overhead down to a lower percentage than if that assumed period had been longer.

The testimony is by no means sufficient to convince us that the commission's allowances are unreasonably low and we approve them, though we must not be understood as holding that we would disapprove a different percentage in another case upon a different state of facts.

XIII. WORKING CAPITAL. Appellant claimed $10,000 for working capital. The commission allowed $7,000. In this connection we quote from the testimony of Mr. Morrow as follows:

"I will say that it has ordinarily been our practice, and I think the practice of a good many engineers, to get a figure for working capital, to take one-tenth of the gross income. But in this particular case I did not think that was fair to the company, because of the fact that the city bills had to go six months. So I took the total revenue of the company, and subtracted the city revenue from that. I took one-tenth of the remaining revenue as being the working capital for the private consumers. Then I took and worked out what the working capital for the city part of this should be, and found that to be $2496. This gave me a total of $6991, and I called it an even $7,000 for working capital. Now, I might say that the basis for these figures of one-tenth of the gross income is usually based on plants where the bills are all collected after the service is rendered.

298 Mo.—35

Now, there are some bills that are collected in advance by this company, but I figure that that was sort of balanced by the delinquency of some of the State bills. And in that way I arrived at my figure of $7,000.''

We approve the allowance of $7000 for working capital.

XIV. DEPRECIATION. As already noted, the depreciation deducted by the commission was $38,026, being twelve per cent of what it determined to be the cost of reproduction new of the depreciable items. Appellant urges that this was too much. It contends that depreciation should have been figured in accordance with what it designates as the ''sinking-fund method,'' and that so figured it would not have exceeded eight per cent. It urges that the ''straight-line method'' which was used by Mr. Morrow (whose deduction was approximately twenty-four per cent), while a proper method to be used in cases involving short-lived and inexpensive property, such as tools and floating equipment, is not the proper method to be employed where valuable structures and machines are under consideration, whose lives extend over a long period of years. That in the latter cases the sinking-fund method should be employed. The difference between the two methods is attempted to be demonstrated by appellant's witnesses by charts and explanations long and somewhat technical and involved, from which surmise and prophecy are not entirely absent. Having determined (by best judgment from observation and experience) the life-expectancy of the machine or unit, a sinking fund is created, into which is paid annually an amount which, with its interest increment from year to year, will be sufficient to renew or replace said machine or unit at the end of its useful life. Such in brief is the sinking-fund method. The straight-line method involves estimating the life of the machine or unit, and then deducting from its value such proportion thereof as its age bears to its estimated life-expectancy. For example, if a machine is estimated to

live or be useful twenty years, then at the end of its
first year it should be depreciated one-twentieth, or five
per cent. If it has been in use five years, it should be
depreciated five-twentieths, or twenty-five per cent, etc.
Since the straight-line method takes no account of accruing interest, it is manifest that its use in determining depreciation yields a larger amount (as depreciation) than does the sinking-fund method. However, its
advocates claim that the sinking-fund method confuses
depreciation and a reserve fund, which they assert are
two entirely separate and distinct things.

It would be unprofitable for us to analyze and contract these two methods, for the commission, properly,
we hold, declined to be bound by either, but, after considering and weighing both and personally examining
the property, concluded that the property was in eighty-
eight per cent condition.

Considering all of this testimony, as well as the testimony touching the age and life-expectancy of the various units going to make up appellant's waterworks system, it is our conclusion that the evidence fails to show
that the amount deducted by the commission for depreciation was too great.

XV. BROKERAGE. Concerning the item of $21,735
brokerage claimed by appellant, it was not contended
that any such expenditure was actually incurred, but
the commission was asked to consider "that before the
days of commissions it was customary to capitalize it."
Further, that ordinarily in the construction of a waterworks plant it would be found necessary to incur an expenditure for brokerage either in the borrowing of money
or in the sale of stock, or in the issue of bonds. Hence,
it is referred to by one of appellant's witnesses as "cost
capital," though the same witness conceded "it has, in
modern waterworks practice, no place except in operating expenses."

In disallowing a like item in Galveston Electric Company v. Galveston, 42 Sup. Ct. Rep. l. c. 355, the Supreme

Court of the United States, through Mr. Justice BRANDEIS, said:

"If base value were to be fixed by the money expended, brokerage fees actually paid might with propriety be included as are taxes paid pending construction. But as the base value considered is the present value, that value must be measured by money; and the customary cost of obtaining money is immaterial. We cannot say that the court erred in refusing to include in base value an allowance for hypothetical broker's fees."

So here we approve the disallowance, by the commission of this hypothetical expense.

XVI. GOING VALUE. In their reply brief counsel for appellant say: "Appellant makes no contention with reference to the manner of the commission's allowance for going value. The point urged is that the amount allowed was inadequate." Whether this point be good we will consider presently.

XVII. Accordingly we approve the commission's finding as to the cost of reconstruction new less depreciation.

Having found the actual or historical cost of the units then in use to be $338,582, the actual investment of appellant to be $358,881 (exclusive of depreciation since the purchase in July, 1912), the reproduction cost new (including working capital) less depreciation to be $317,555, the commission concluded from all of the evidence that the reasonable value of the waterworks plant, considering it as a going concern in successful operation, as at January 1, 1917, was $360,000. The commission said:

"After considering all of the evidence in these cases the commission finds that the fair present value of the waterworks property of the Capital City Water Company at Jefferson City, Missouri, as of the first day of January, 1917, for fixing the reasonable maximum rates for water service, and considering said water works

as a going concern and in successful operation, and including working capital and all other elements of value, tangible and intangible, as used by the company in serving the public, is the sum of $360,000.''

At this point it should be noted that at subsequent hearings appellant offered evidence to show that during the years 1917 and 1918 it made capital expenditures aggregating $17,380.65. These were added by the commission, and $379,380.65 was considered as the base value upon which the rates were to be determined.

XVIII. The question remains whether due consideration was given by the commission to the so-called going value. By ''going value'' we understand to be meant the value, distinct from the good-will which inheres in a plant where its business is established as distinguished from one which has yet to establish its business. [Des Moines Gas Co. v. Des Moines, 238 U. S. 153, l. c. 165.] Or, as said in Knoxville v. Knoxville Water Co., 212 U. S. 1, l. c. 9, it is ''an expression of the added value of the plant as a whole over the sum of the values of its component parts, which is attached to it because it is in active and successful operation and earning a revenue.''

As thus defined, did the commission sufficiently include going value in arriving at the base value of appellant's property for the purpose of fixing rates? Appellant contends not, but does the evidence offered by it adequately discharge the burden of so proving? In its evidence appellant referred to going value as being ''the value of a created income;'' again, as ''what it would cost to reproduce the income as of today;'' again, as ''that is the going value which will produce the return that we must have on that investment;'' again, ''there is always a going value because there is always a cost of getting an income;'' ''the reproduction of the income.''

It would thus seem that appellant's conception of ''going value'' is the cost of producing income. This cost it would determine by comparing the existing plant

as a going concern, organized and operating, with an hypothetical, or similar plant to be constructed. Having estimated the time required to construct the hypothetical plant and to secure for it the patrons already possessed by the existing plant, and the rate per year at which these customers could be obtained, and the annual receipts and expenses of the actual and hypothetical plants during this period, the summation of the net differences between the net revenues of the two plants during the period represents "the cost of producing the income" and, therefore, the "going value" of the existing plant.

Appellant despaired of satisfactorily explaining to the commission the accounting necessary to this process, frankly stating that it was "useless to try to do that." We could hardly be expected to lend our approval to a matter so important in the absence of the fullest explanation. Furthermore, in so far as this method is explained, we are prone to believe that the cost of reproducing the income thus computed includes as well the cost of developing the company's good-will. If so, it represents good-will value as well as "going value," in the sense in which appellant employs the latter term. Indeed, from appellant's foregoing definitions of "going value," as well as its method of determining it, it would seem that appellant either confuses "going value" with good-will or includes good-will with it. Note also the following in the examination of Mr. Alvord:

"MR. DUMM: Q. Now may I ask you this question: What relation does monopoly have on going value, if any? A. No relation at all.

"Q. Every business has a going value. The grocery business has a going value by reason of the fact that it has had to go out in the market in competition with other grocery business and build up its customers and get its customers' business?' A. Yes, sir, this is going value."

Good-will should not be considered in valuation for the purpose of rate-making. [Willcox v. Consolidated

Gas. Co., 212 U. S. 19; Cedar Rapids Gas Light Co. v. Cedar Rapids, 223 U. S. 665; Des Moines Gas Co. v. Des Moines, 238 U. S. 153; Galveston Electric Co. v. Galveston, 42 Sup. Ct. Rep. 351.]

Other possible objections to this so-called "comparative method" of determining "going value" occur to us, but we withhold them in view of appellant's abbreviated demonstration of this method, lest we have misunderstood it.

Not only does appellant's evidence fail to convince us that the commission did not sufficiently consider going value as *we* have defined that term, but, on the other hand, it affirmatively shows that adequate consideration was given to it as *appellant* seems to conceive it. During the examination of Mr. Alvord, witness for appellant on this point, the following occurred:

"MR. DUMM: Q. Now suppose that a new company buys all the properties of the present water company, paying for the properties the present reproduction value of the plant of the old company. The old company has a monopoly of the business; the public would be compelled to patronize the new company just as it has been compelled to patronize the old company. There is no competition for the business. Now, in view of the fact that there is a monopoly; that the public must, whether it wants to or not, patronize the new company that succeeds to the rights and privileges of the old company, where is there any room for going value?

"A. By MR. ALVORD: Going value is part of the reproduction that you speak of. You have not reproduced your plant on the basis that you are going to make this transfer until you have computed the reproduction of the business. Reproduction is not complete. The reproduction of the income is just as much a part of your reproduction as reproduction of your pumps or your pipes. And if you have made a complete reproduction of the plant, cost of building that property as of today, as a basis of transfer of this old company to a new com-

pany, you are done. They have paid the fair value, if they bought the value of the property."

Now, as we have already noticed, appellant in July, 1912, bought this plant and paid for it $273,610. (Note, that is $295,000, less cash and equivalent on hand, amounting to $21,390.) The purchase was negotiated by Mr. Chester, appellant's vice-president, after an appraisal by him of the plant, and it is manifest, from his testimony, that appellant paid full value. Indeed, the only doubt seemed to be whether appellant paid too much. Since this purchase price was full and adequate and had regard necessarily to the plant, its business, franchise and good-will, as well as its tangible units, it included, of course, under the foregoing excerpt from Mr. Alvord's testimony, appellant's conception of the then going value of the plant. There is nothing in the record which persuades us that the going value (as defined by appellant) had materially enhanced up to the time of the hearing of this cause by the commission in 1917. Indeed the surplus income in 1910, 1911 and 1912 was more than in 1914, 1915, 1916. Since the commission, considering the plant as a going concern in successful operation, valued it as of January 1, 1917, at $360,000, it is manifest that the element of going value, even regarding that term in the sense seemingly employed by appellant, was sufficiently included.

XIX. REASONABLE VALUE: RULE APPROVED. The question for the commission's determination in this connection was the reasonable value of the property at the time it was being used for the public. In the language of the Minnesota Rate Case, 230 U. S. 434: "The ascertainment of that value is not controlled by artificial rules. It is not a matter of formulas, but there must be a reasonable judgment having its basis in a proper consideration of all relevant facts."

The commission, in determining the value of appellant's plant, considered its historical cost, the investment cost to the present owners, its reproduction

cost new less depreciation, the fact that the plant was a going concern in successful operation, included working capital and all other elements of value, tangible or intangible, used by the company in serving the public. This identical method was employed in State ex rel. Southwestern Bell Telephone Co. v. Public Service Commission, 233 S. W. 425, and concerning it we said, at page 435, "that the commission's total valuation of appellant's property was arrived at as to method, time of estimation, and amount, in a legal and authorized manner, and afforded substantial basis for the fixing of the rates and the consequent judgment of the circuit court affirming the Commission's action."

It is the method prescribed in Smythe v. Ames, 169 U. S. l. c. 546, concerning which, in the same case, we said: "Doctrinaires may have criticized the basis on which the Smythe-Ames and subsequent cases rest, but it has not been overruled, nor subjected to serious judicial criticism. To vary from this rule, which comprehends within its scope all reasonable items of value and elements of cost, . . . does not accord with reason, and would be unjust to the public."

We reiterate our approval of the rule of Smythe v. Ames, and of the method of fixing value employed by the commission in the instant case.

XX. FINDINGS APPROVED. Bearing in mind the presumption of correctness that attends the commission's findings, after a most careful and critical review of all the evidence we find ourselves not only not convinced that any of the commission's findings, with respect to value, were unjust, but, on the contrary, are entirely satisfied that said findings, and each of them, were abundantly supported by the evidence, were proper, reasonable and just, and we approve them.

XXI. ESTOPPEL. Furthermore, throughout the various hearings before the commission, appellant's conduct and attitude with respect to said findings were not

such as would usually characterize one entirely dissatis-
fied with such findings. Indeed, it might, with much
force be urged here that appellant has estopped itself
from now complaining of the value placed upon its prop-
erty by the commission. Since that is not urged, and we
have sufficiently disposed of the matter otherwise, the
point is not decided. However, it is not amiss for us
to give warning of our possible disapproval of the prac-
tice that would allow a utility to petition the commis-
sion to fix rates on the basis of a certain named valu-
ation already found by the commission and then, when
the rates are established, if they are unsatisfactory, ac-
cept them "under protest," and, while using them, at-
tack both the base valuation and the rates.

XXII. WERE THE RATES WHICH THE COMMISSION
FIXED UNJUST OR CONFISCATORY? "As to what is a rea-
sonable rate, in any given case, is, as we have stated, a
question of fact calling for the exercise of the common
sense and sound judgment of the commission, which is
not bound by any hard-and-fast rule, nor required to fix
rates according to any general formula. Even the
question as to what per cent of the value of the proper-
ty in use should be allowed as a return must be made
dependent upon the facts and circumstances of the par-
ticular case." [State ex rel. v. Public Service Commis-
sion, 233 S. W. l. c. 431. See also State ex rel. v. Public
Service Commission, 236 S. W. 852.]

In its report and order of January 29, 1918, the
commission, after finding the fair present value of ap-
pellant's property as of January 1, 1917, to be $360,000,
further found that appellant was entitled to earn seven
per cent of the value of its property as return, and one
and one-half per cent in addition thereto for deprecia-
tion, surplus and contingencies; and that additional rev-
enue of approximately $9,000 would be required to yield
that amount. On February 25, 1918, following a hear-
ing upon a motion for rehearing, the commission found
that because of the abnormal increase in the cost of op-

erations brought about by war conditions, an increase of $13,503 of revenue, instead of $9,000, would be required to yield seven per cent return and one and one-half per cent for depreciation, and ordered that the rates therein fixed (estimated to yield the additional $13,503) be in effect after the first day of April, 1918, and until the first day of April, 1919. Meanwhile the commission reserved jurisdiction for the purpose of making further investigation and fixing rates after the rates in said order prescribed had been in effect one year.

Within the year following appellant unsuccessfully petitioned for a modification of this order by having the rates increased, and *following* the expiration of the test year (expiring April 1, 1919), to-wit, on June 3, 1919, filed its Supplemental Petition No. 2, in which (and in the amendment thereto) it averred additional capital expenditures since December 31, 1916, amounting to $19,-380.65; that the test period had produced a deficit of $13,530.99 (that is, that amount less than eight and one-half per cent net of $360,000, plus the additional capital expenditures), and prayed the commission "to revise and re-adjust said tentative schedule of rates, so that same will allow it a rate of return for the ensuing year as prescribed by the commission in its orders and decisions on the total value of $379,380.65, and for the amortization of said deficit of $13,530.99 for said year as aforesaid."

At the hearing upon this Supplemental Petition No. 2, and the said amendment thereto, appellant presented testimony intended to show that its future operating expenses would equal, if not exceed, those of test year just past and that for said test year (ending April 1, 1919) its gross operating revenue was $69,579.90; that:

| | |
|---|---|
| Its operating expenses, excluding taxes and depreciation, were | $46,133.99 |
| To the total operation expenses appellant added its taxes, prorated | 4,390.40 |
| Depreciation of one and one-half per cent | 5;628.14 |

Seven per cent return on plant value ....     26,275.29
Amortization of cost of hearing ($3,000,
     amortized over a period of five years)     600.00

Making, as claimed by appellant, the ag-
     gregate amount necessary to have
     paid operating expenses, taxes, de-
     preciation and return, ........... $83,027.82

Since the actual gross income for the year was $69,-579.90, appellant claimed a deficit on account of the operations for the year of $13,447.99, which it contended should be amortized at six per cent over a five-year period and repaid at $3192.65 per year.

Accordingly appellant urged that the commission should raise the rates sufficiently to yield a gross income of $86,364.40, that aggregate being made up of the following items:

Operating expenses, including taxes, as
     tested by the year ending April 1,
     1919 .......................... $50,524.39
Eight and one-half per cent on $379,380.65     32,247.36
One-fifth cost of hearing .............     600.00
One-fifth deficit for year ending April 1,
     1919, plus six per cent interest ....     3,192.65

        Total revenue required ........ $86,364.40

With its testimony appellant filed a schedule of rates which it said would yield this revenue, and which it asked the commission to approve and make effectual.

In its report and order upon this Supplemental Petition No. 2, made October 30, 1919, the commission treated as being the present value of appellant's property the amount prayed for, to-wit, $379,380.65. It further accepted appellant's figures of receipts and expenses for the test year ending April 1, 1919, except that it added to the receipts $1584.81 of so-called "non-operating revenues," giving as the total receipts for said year $71,164.71, and the total operating expenses, in-

cluding taxes, $50,524.39, or a net income of $20,640.32. After observing that the rates had yielded $15,643 in excess of the revenues for the year 1917, and that the schedule of rates proposed by appellant, intended to still further increase the revenue by the sum of $13,000, would make the total revenue fifty-three per cent more than that yielded by the old rates, the commission held that said proposed rates were unreasonably high, and that the claim made by appellant for additional revenue of $13,000 was excessive to the extent of $6500. And it would seem that the commission was of the opinion that the deficiency of which appellant complained was attributable, in part at least, to inefficient operating methods, particularly, as the commission thought, to the failure to install and use electrically-driven centrifugal pumps instead of the steam-driven pumps used by appellant.

Accordingly the commission ordered that certain increased rates which, with the rates already in force, it estimated would yield an additional revenue of $6500, might be charged by appellant for an experimental period of thirteen months from November 1, 1919, to and including November 30, 1920, "at the end of which period such increased rates and charges of the Capitol City Water Company shall then be reduced by the said company to the rates and charges which are at present in force and effect. *Provided,* that the commission may hereafter by further order continue such increased rates of charges for another or further period, or otherwise change or modify the rates and charges of said company." And further, that "the commission fully retain jurisdiction of the parties and subject-matter hereof, to continue, change or modify the rates and charges of said company upon the expiration of said period of thirteen months after the effective date of this order." The effect of this order, as we construe it, was to establish temporary rates for an experimental period, that is, to establish for an experimental period of thirteen

months the then existing (unchanged) and the then increased rates.

The motion for a rehearing having been filed and granted, appellant offered testimony to prove, and which we think did prove, that there would be no saving by equipping its plant with electrically driven pumps, and that its plant was economically and efficiently operated. On March 6, 1920, in its report on said motion for rehearing, the commission found "that the company has shown that it is not feasible at the present time to make the changes and additions necessary to enable it to reduce the cost of preparing and pumping the water and that the company has successfully carried the burden of showing that the operating expenses of the company do not reflect incompetence or inefficient management." But the commission further held that "it does not follow, however, that further increase in rates should be granted to the company." The commission was of the opinion that to authorize the further increase of rates would likely result in discouraging the consumption of water and would thereby diminish, instead of increase, the revenue and, in that connection, in addition to calling attention to the increase in rates already granted, and the fact that, accepting as the present value of appellant's property $379,380.65, no depreciation had been deducted which had accrued since the first day of January, 1917, the commission also commented upon the fact shown by the evidence that the per-capita consumption of water in Jefferson City was thirty-nine gallons annually, whereas statistics from one hundred and forty plants throughout the country, compiled by the American Water Works Association in 1915, showed that only fifteen plants had a consumption of as low as fifty gallons, or less, per capita. The commission was, therefore, of the opinion, and so held, that the rates could not be further increased above those estimated to yield the additional $6500 allowed, without a consequent decrease in gross revenue; and that the evident need of the

company was to secure more liberal use of water by its consumers, rather than to further increase its rates, with loss of consumption already threatened. Accordingly the commission adhered to its order of October 30, 1919, which, as already noticed, prescribed certain increased rates, which, with the existing unchanged rates, were estimated to yield additional revenue of $6500 for the test period of thirteen months ending November 30, 1920.

XXIII.  It is urged by appellant that since it proved, and the commission so found, that no part of its "deficit" for the year ending April 1, 1919, was due to its equipment or inefficient management, the commission should have granted the rates proposed by appellant, and that since the increase granted by the commission seemingly was insufficient to yield a net return of eight and one-half per cent, and an additional amount sufficient to amortize the cost of the hearing, and said deficit, such rates should be held to be confiscatory.

XXIV.  Manifestly this conclusion does not follow. The law, of course, did not require that the rates at any time yield any particular return.  As we have already noticed, what is a reasonable return in any given case is a question calling for the exercise of the common sense and sound judgment of the commission, which is not bound by any hard-and-fast rule.  It may well be that rates sufficient to yield seven per cent for return and one and one-half per cent for depreciation were reasonable when the commission made its orders of January 29, 1918, and February 25, 1918, but it does not follow that rates which might yield a slightly lesser sum during the thirteen months from November 1, 1919, to November 1, 1920, would be confiscatory.  It might well be that had the commission prescribed rates sufficient to yield seven per cent for return and one and one-half per cent for depreciation, its action, under the evidence, would have met with the approval of this court (though as to that we express no opinion); but even so, it does not of

necessity follow that this court should disapprove rates that may yield a somewhat lesser amount during a test period. The commission's order of October 30, 1919 (re-affirmed March 6, 1920), as we have interpreted it, es-tablished tentative rates and a test period; that too, at a time of post-war and abnormal conditions, when it was reasonable to expect a recession of prices which would result in diminished operating expenses.

Furthermore, under the already increased rates ac-corded appellant, the unusually low per-capita consump-tion of water not without reason led the commission to conclude that rates beyond those granted would be so high as to be unreasonable and as to result in further diminishing the consumption of water.

An excerpt from the opinion of this court delivered by GRAVES, J., in State ex rel. v. Public Service Com-mission, 269 Mo. 525, at page 535, is not without perti-nence:

"To be more pointed, such corporations should not be permitted to fix an exorbitant rate for their product or service, and then tie the hands of the Public Service Commission, by showing that at those rates their busi-ness is unprofitable. A large percent of profit on limited sale will often not yield, in the aggregate, as much ac-tual profit as a small per cent of profit on larger sales. The price of a product may be made so high as to pre-clude its general use. These are all vital questions for determination by the Public Service Commission."

XXV. Appellant's gross income for the test year ending April 1, 1919, was (including non-operating rev-enue), as we have already observed, $71,164.71. Its ex-penses, including taxes, were $50,524.39, leaving for depreciation and return $20,640.32. The commission granted rates which for the test period November 1, 1919, to November 30, 1920, were intended to yield an increased revenue of $6500. Therefore, upon the as-sumption that during this thirteen months' period the expenses would be as great as in the year ending April

1, 1919, except that $600 would be added to amortize, over a period of five years, the cost of the present hearing, the rates would yield appellant, for the thirteen months test period, the net aggregate of $26,540.32 for depreciation and return, or just about seven per cent upon the value of appellant's plant as determined by the Commission and approved by us, to-wit, $379,380. Allowing one per cent for depreciation would leave about six per cent for net return upon the investment. Mr. Alvord and Mr. Chester, appellant's two witnesses who gave testimony as to the percentage that should be allowed to cover depreciation, both agreed that one per cent would be reasonable.

The question, therefore, is whether, under the unusual facts of this case, rates for a thirteen months' period, which will yield a net income of about seven per cent for depreciation and return, or approximately six per cent for return after allowing one per cent for depreciation, should be held to be unreasonably low or confiscatory. We answer this question in the negative.

XXVI. When it is recalled that in fixing the plant value nothing was deducted to represent depreciation from January 1, 1917; that the time was abnormal, and it was reasonable to expect substantial recession in prices and interest rates; that the per-capita consumption of water gave warning that the limit of endurable rates was near; that included in the foregoing operating expenses was an item of $2,000 salary (more than one-half of one per cent of the plant value) to the vice-president and general manager, who lived in Pittsburgh and rarely came to Jefferson City; that the rates prescribed were not intended to be necessarily permanent, but only temporary, and for a test period, we think the action of the commission was such as prudence would dictate and fairness approve.

As said by Mr. Justice HOLMES in Cedar Rapids Gas Light Company v. Cedar Rapids, 223 U. S. 655, l. c. 669:

298 Mo.—36

"It would require a very clear case to warrant the reversal of the decree of a State court which though final in form merely postpones a decision upon the merits for further experience."

Again, in Des Moines Gas Company v. Des Moines, 238 U. S. 153, l. c. 173: "Ordinarily time alone can satisfactorily demonstrate in a case like this whether or not the rates established will prove so unremunerative as to be confiscatory in the sense in which that term has been defined in rate making cases." And the Supreme Court refused to disapprove rates estimated to yield a return of six per cent.

Yet again, in Knoxville v. Knoxville Water Company, 212 U. S. 1, at page 17: "Upon any aspect of the evidence the company is certain to obtain a substantial net revenue under the operation of the ordinance. The net income, in any event would be substantially six per cent, or four per cent after an allowance of two per cent for depreciation.   [See Stanislaus County v. San Joaquin and K. River Canal and Irrig. Co., 192 U. S. 201.]   We cannot know clearly that the revenue would not much exceed that return.  We do not feel called upon to determine whether a demonstrated reduction of income at that point would or would not amount to confiscation.   Where the case rests, as it does here, not upon observation of the actual operation under the ordinance, but upon speculations as to its effect, based upon the operations of a prior fiscal year, we will not guess whether the substantial return certain to be earned would lack something of the return which would save the effect of the ordinance from confiscation.  It is enough that the whole case leaves us in grave doubt."  [See also Galveston Electric Co. v. Galveston, above referred to.]

And so in Wilcox v. Consolidated Gas Company, 212 U. S. 19, l. c. 42, Mr. Justice PECKHAM, speaking for the court, said: "Of course, there may be cases where the rate is so low, upon any reasonable basis of valuation, that there can be no just doubt as to its confiscatory

nature; and in that event there should be no hesitation in so deciding, and in enjoining its enforcement, without waiting for the damage which must inevitably accompany the operation of the business under the objectionable rate. But where the rate complained of shows in any event a very narrow line of division between possible confiscation and proper regulation, as based upon the value of the property found by the court below, and the division depends upon opinions as to value, which differ considerably among the witnesses, add also upon the results in the future of operating under the rate objected to, so that the material fact of value is left in much doubt, a court of equity ought not to interfere by injunction before a fair trial has been made of continuing the business under that rate, and thus eliminating, as far as is possible, the doubt arising from opinions as opposed to facts.'' In this case the court refused to disturb as confiscatory an eighty cents gas rate, which it was estimated would yield 5.6 per cent to cover both depreciation and return.

In Stanislaus County v. San Joaquin and K. River Canal & Irrig.. Co., 192 U. S. 201, l. c. 213, the court declined to set aside as being confiscatory water rates which would produce a return of six per cent. Indeed, this court heretofore reversed the judgment of a circuit court, which set aside as being too low rates which we found would yield 6.83 per cent for depreciation and return. [See State ex rel. v. Public Service Commission, 236 S. W. 852.] We there said, page 858: ''Accordingly, when the commission established rates which would produce an increase in revenue of $11,500, or by adding such increase to the profit from operations for 1919, a return of approximately 6.83 per cent on the fair value of the property, we are not prepared to substitute our judgment for that of the commission and say that such rates were unreasonable.''

XXVII. Appellant's contention that the commission erred in refusing to amortize with six per cent over

a period of five years its so-called "deficit" of $13,447.92, accruing during the test year ending April 1, 1919, should be disallowed.   There is no warrant in the law either for the capitalization of such past losses or for their inclusion in future operating expenses for the purpose of determining future rates.  Returns otherwise reasonable cannot be rendered confiscatory by such charges. Furthermore, it would seem to be inequitable to collect such charges from consumers perhaps new and different from consumers who it is claimed should have paid the charges in the first instance.   In this connection it should be observed that neither in its motion of October 30, 1919, for a rehearing of the Commission's finding of that date, nor in the motion for a new trial filed in the court below, did appellant specifically except to the disallowance of this claim.   [Lusk v. Public Service Commission, 277 Mo. 264; City of Macon v. Public Service Commission, 266 Mo. 484.]

XXVIII.   Appellant urges that it earned only the following percentages of return for the years mentioned, to-wit:

| Year | Percentage |
|---|---|
| 1914 | 4.6 |
| 1915 | 3.7 |
| 1916 | 4.0 |
| 1917 | 3.2 |
| 1918 | 3.1 |
| Year ending April 1, 1919, | 3.5 |

Even if true, this experience would not change our judgment.

Past earnings may be considered in determining whether the rates charged by the utility are reasonable, but they should not incite the establishment of exorbitant future rates; neither should they influence us to hold to be confiscatory for the future, rates otherwise reasonable.

But we cannot agree to the correctness of appellant's figures.  They have been arrived at, first, by assuming

a base plant value of $360,000 for the years 1914, 1915 and 1916, and of $371,716 for 1917, and $379,380 for 1918, and to April 1, 1919; second, by assuming to be entitled to one and one-half per cent of the said plant values for depreciation; and, third, by adding taxes to the amounts of depreciation thus computed, upon the assumption that taxes were not included in the table of revenues and expenses furnished by appellant, to-wit:

| Year. | Revenues. | Expenses. | Net Income. |
|---|---|---|---|
| 1914 | $50,185.22 | $27,139.23 | $23,046.39 |
| 1915 | 51,146.75 | 30,821.07 | 20,325.68 |
| 1916 | 53,008.38 | 31,368.15 | 21,640.23 |
| 1917 | 53,936.55 | 34,168.75 | 19,767.90 |
| 1918 | 66,106.65 | 44,437.12 | 21,669.53 |
| Year ending | | | |
| April 1, 1919 | 71,164.71 | 50,524.39 | 20,640.32 |

The evidence further discloses that the revenues, expenses and net profits for 1912 and 1913 were as follows:

| Year. | Revenues. | Expenses. | Net Income. |
|---|---|---|---|
| 1912 | $42,516.05 | $22,137.35 | $20,378.70 |
| 1913 | 49,772.90 | 27,391.33 | 22,381.57 |

Now it appears that after paying $273,610 for the plant in July, 1912, appellant made capital expenditures thereon to January 1, 1917, as follows:

| | |
|---|---|
| In 1912, ......................... | $ 7,356.35 |
| In 1913, ......................... | 9,028.56 |
| In 1914, ......................... | 39,931.55 |
| In 1915, ......................... | 18,739.48 |
| In 1916, ......................... | 10,215.54 |

Assuming, as we have already found, that full value was paid for the plant, it seems that, for the purpose of determining the rate of return appellant was receiving, the base value should be the purchase price enhanced by the capital expenditures. So considered the base values to 1917 would be as follows:

| | |
|---|---|
| 1912 ............................. | $280,966.35 |
| 1913 ............................. | 289,994.91 |

State ex rel. Water Co. v. Public Serv. Commission.

1914 ........................... 329,926.46
1915 ........................... 348,665.94
1916 ........................... 358,881.48

Following January 1, 1917, capital expenditures were made by appellant as follows:

1917 ........................... $11,716.33
1918 ........................... 7,664.32

Adding these expenditures to the plant value as at January 1, 1917, as found by the commission and approved by us, to-wit, $360,000, gives us as the base values for computing the rate of return received after January 1, 1917, the following, to-wit:

1917 ........................... $371,716.33
1918 ........................... 379,380.65

An examination of the so-called "comparative profit and loss account for three years ending December 31, 1916," offered in evidence, leads us to believe that in the foregoing figures of expenses for the years 1914, 1915 and 1916 taxes were included. They were also included in the above expenditures for 1917 and the year ending April, 1, 1919. Though in some doubt, we think they were also included in the foregoing expense figures for the years 1912, 1913 and 1918. In other words, all the above figures of expenses include all allowable operating expenses except depreciation. We observe also that down to the year 1915 they included $2000 per year, and thereafter until 1919, $1000 per year, "salary" paid to appellant's president and owner of two-thirds of its stock, Mr. W. H. Donner, of Philadelphia, Pennsylvania, who has never visited Jefferson City. Furthermore, no depreciation whatever is deducted from the capital expenditures made since July, 1912: Calculating the percentage of return upon the foregoing base values (using $360,000 as the value for 1916) the percentages received by appellant for depreciation and return have been as follows:

*Year.*                          *Percentage of Return.*
1912 .................................... 7.3
1913 .................................... 7.7 plus

1914 ................................ ..About 7
1915 .................................. 5.9
1916 .................................. 6 plus
1917 .................................. 5.3 plus
1918 .................................. 6
Year ending April 1, 1919. ............ 5.5

Or an average for the seven years of approximately 6.5 per cent.

XXIX. We are unwilling to hold, therefore, that under the evidence the rates established by the commission for the thirteen months period ending November 30, 1920, were unreasonable or confiscatory.

XXX. MOOT CASE. Furthermore, is it not true that this has now become a moot case? Of what avail would it be to appellant should we hold that the rates prescribed were confiscatory? The case is here merely upon an appeal without bond from the judgment of the circuit court affirming the orders of the commission. Under the act, the circuit court has no power to go further by its judgment than to affirm or reverse the judgment of the commission, and our jurisdiction being derivative, the proper judgment for us to enter is one either approving or disapproving the judgment of the court below. [Railroad v. Public Service Commission, 266 Mo. 333; see also City of Macon v. Public Service Commission, 266 Mo. 484.] We could not, of course, undertake to prescribe what rates should obtain in the future for "rate making is no function of the courts and should not be attempted either directly or indirectly." [Newton v. Consolidated Gas Co., 42 Sup. Ct. Rep. 264.] Indeed, we cannot know to what extent appellant's income or expenses have been affected by the important changes which have occurred since the entry of the judgment below. As stated in Galveston Electric Company v. Galveston, 42 Sup. Ct. Rep. at page 357:

"The occasion for the suit was solely the extraordinary rise in prices incident to the war. . . . But nearly three years have elapsed since the board adopted

the ordinance and more than a year since the entry of the decree below. We know judicially that the period has, in general, been one of continuous price recession and that the current rates of return on capital are much lower than they then were. But we cannot know to what extent the important changes occurring have affected either gross revenues or the net return· There is no reason to believe that the board would not give full and fair consideration to a proposed change in rate if application were now made to it."

Accordingly should it be our opinion (and it is not) that the rates were confiscatory, even as tentative rates over a test period, and we should reverse and remand upon that ground, of what avail would that be to appellant? It could only make application, should it think it wise, for increased rates. Upon the other hand, should we be unwilling (as we are) to say that upon the whole record and under the circumstances then prevailing the rates prescribed were unreasonably low, and affirm the judgment of the court below, it would still be appellant's right to make the same application to the commission. Indeed, as we have already noticed, the commission in its order of October 30, 1919, fully retained jurisdiction of the parties and subject-matter for the purpose of continuing, changing or modifying the rates and charges upon the expiration of the thirteen months' test period.

XXXI. Since we approve the action of the commission there is no occasion to consider whether the lower court erred in declining to suspend its judgment pending this appeal.

It follows that the judgment of the circuit court should be affirmed and it is so ordered. *Higbee, Walker* and *James T. Blair, JJ.,* concur; *James T. Blair, J.,* in separate opinion; *Woodson, C. J., Graves* and *Elder, JJ.,* dissent; and *David E. Blair, J.,* not sitting.

JAMES T. BLAIR, J.—In paragraph 1 of the opinion the learned special judge has approved certain decisions of this court which, in my opinion (see State ex

rel. Bell Telephone Co. v. Public Service Commission, 233 S. W. 436 et seq.), are contrary to the rule in practically all other jurisdictions, contravene express statutes of this State, and are in conflict with the State Constitution. This is, or was, a proceeding to fix rates for the future, and is not one to determine the validity of rates already fixed, as in cases in which rates statutes are assailed as confiscatory. From this paragraph I dissent, but concur in the remainder of the opinion and the result.