OMAHA & COUNCIL BLUFFS STREET RAILWAY COMPANY, APPELLANT, v. NEBRASKA STATE RAILWAY COMMISSION ET AL., APPELLEES.

FILED JULY 16, 1919. No. 20913.

1. Carriers: RATES. The fundamental inquiry in fixing the rates of a public service utility always is: What rate is necessary in order to yield a reasonable average return on a fair valuation of the property for rate-making purposes, such a return as will not discourage, but will attract, the investment of capital in the utility?

2. State Railway Commission: POWERS. Under the Constitution and laws of this state, the state railway commission has a wide discretion in these matters.

3. Carriers: RATES. A situation, due to an unexpected rise in prices and wages, which makes it altogether probable that the past and present rate is insufficient to yield a revenue which will pay that fair average return which the law requires, although not constituting what would technically be denominated an "emergency," may, when shown, be sufficient for the allowance by the commission of a temporary rate, limited to the time required for making an investigation and finding of the facts. If it should happen that the temporary rate so fixed is too high, the condition may be rectified in the order fixing the rate after investigation.

4. ———: ———: EARNINGS. In fixing the rates at any particular time, former earnings and probable prospective earnings should always be considered, with a view to so adjust the rates as to prevent extortion and allow a fair average return.

696　　　　NEBRASKA REPORTS.　　　[Vol. 103

Omaha & C. B. Street R. Co. v. Nebraska State Railway Commission.

5. ———: ———: POWER OF RAILWAY COMMISSION. The law contemplates that the findings and orders should be made in the first instance by the commission, which has powers of its own that the courts may not usurp. Its orders will not be reversed unless clearly wrong.

6. ———: ———: ———. The act, known as the "Railway Commission Act" (Laws 1907, ch. 90, Rev. St. 1913, sections 6104-6158), gives exclusive original jurisdiction of cases like this, involving the rates of common carriers, to the state railway commission, and is not changed by the provisions of the Omaha charter.

APPEAL from the State Railway Commission. *Reversed, with directions.*

*John L. Webster,* for appellant.

*W. C. Lambert* and *Hugh LaMaster, contra.*

CORNISH, J.

The state railway commission denied the application of the plaintiff street railway company for an increase of its fares from five to seven cents. Plaintiff appeals.

The application is denominated by the plaintiff as one for emergency or temporary rates, due to conditions brought about by the war, causing a large and unexpected increase in wages and cost of material and supplies, making it temporarily impossible for the company to continue paying its fixed charges and a return upon the reasonable value of its property.

At the hearing the commission ruled that emergency rates would not be justified, except as a condition is shown which, if not relieved from, will imperil the property of the company and its service to the public, such as might subject the company at once to proceedings in bankruptcy or receivership; that mere inability to make profits or pay dividends would not create an emergency. The plaintiff company, besides insisting that the condition shown was one which imperiled the utility, also contended that a temporary rate should be granted when it becomes clear that the revenues are not sufficient to pay dividends.

In ordinary cases the view taken by the commission, as to when an emergency rate should be allowed, is correct. The fundamental inquiry in fixing rates always is: What rate is necessary in order to yield a reasonable average return on a fair valuation of the property for rate-making purposes, such a return as will not discourage, but will attract, the investment of capital in the utility? It is desirable, if possible, before changing the rates, to know all of the facts, so that the rates may not be temporary and fluctuating.

Under the Constitution and laws of this state, the commission has a wide discretion in these matters. Even though present financial conditions, prices and wages (showing almost unprecedented changes), together with the financial condition of the plaintiff company, do not show a situation which would be technically denominated an "emergency," yet, if they do show a situation which makes it altogether probable that the past and present rate is insufficient to yield a revenue which will pay that fair average return which the law supposes, the commission is empowered, and it may be its duty, to permit a temporary rate, limited to the time required for making an investigation and finding of the value of the property. If it should happen that the temporary rate so fixed is too high, the condition can be rectified in the order fixing the rate after investigation. The purpose of the law being to allow those who voluntarily furnish the necessary capital to install and operate such public utilities a fair average return upon the value of the property so devoted to the public use, and to prevent unreasonable profits, in fixing the rate at any particular time, former earnings and probable prospective earnings should always be considered, with a view to so adjust the rate as to prevent extortion and allow such fair average return.

In the instant case, we believe it is not altogether certain that the street railway company can continue paying present wages and high prices for material, and at the

698 NEBRASKA REPORTS. [Vol. 103

Omaha & C. B. Street R. Co. v. Nebraska State Railway Commission.

same time meet its obligations and maintain its credits, and it is altogether probable that it cannot make profits and pay dividends. If we could assume that a five-cent fare was a reasonable charge before the war, we would know that it is not a reasonable charge under present conditions, because we would take judicial knowledge of the fact that the exchange value of the dollar has lessened, at least temporarily.

We will not go into an extented discussion of the financial condition of the plaintiff company.. The plaintiff's evidence would indicate that since the pre-war period, 1914, there have been increases in the wages of the company's 1200 employees, amounting to $740,000 annually; that taxes have increased $117,000; that these items, together with increased cost of coal, freight charges, material, and supplies, will increase the amount of annual expenditures for operating expenses and repairs in the year 1919, over the year 1914, in the sum of approximately $1,321,518. From this increase should be deducted the increased income to the company from passenger travel, which in the year 1918 was $426,575.13 in excess of that for 1914. For 1919 the excess will be greater, possibly from $150,000 to $200,000 greater. The income from passenger travel for the year 1918 for both Iowa and Nebraska divisions of the road was approximately $3,214,000; for 1914 it was $2,787,424. The total revenues for 1918 were $3,359,115.93, and the expenditures for that year, which included taxes $320,638.84, rent of leased roads $150,900, interest on bonded debt $480,950, and miscellaneous $6,025, amounted to $3,289,319.22. This would leave a net income for 1918 of $69,796.71. The figures are somewhat in dispute, the company putting the net income at $40,150. The operating expenses for 1918 were $2,330,805.38. For 1914 the operating expenses were $1,608,231. The increase in operating expenses for the year 1919, as above indicated, would be much in excess of those for 1918, because the increase in wages, following the order of the national war labor

board, did not go into effect until July 17, 1918. The net income, above shown, of from $40,000 to $70,000 for the year 1918 makes no allowance for dividends ($399,600), but includes other deductions.

It is contended by the plaintiff company that for the year 1919 there must be a deficit in the sum of $422,600; that the fixed charges and obligations of the company cannot be met. This is disputed by the defendants, who contend that to show such a deficit the plaintiff has estimated the operating expenses to be $2,467,000 for 1918, and $2,929,750 for 1919; that $200,000 of this increase for 1919 is in addition to the $300,000 allowed for 1918 for the depreciation account. It is contended that the actual money needed for this account, instead of being $500,000, has never been in excess of $170,000. It is further contended that the statement showing the deficit for 1919 makes no allowance for increased passenger fares, which will in all probability be over $200,000. Attention is also called to the fact that the evidence shows that the company has other operating revenues which have increased annually in about the sum of $15,000 since 1914. It is argued that, instead of a deficit, there will be a net income of $200,000 for the year 1919.

Just what the situation is, it is difficult to say. It would seem that no wrong would be done, which could not be corrected, in allowing such increase in fares as would make the company secure against insolvency for a temporary period. Insolvency might do permanent injury to the utility, for which, in the long run, the people would have to suffer. No great risk of that should be taken. Besides, any appearance of disregard of the company's rights in this respect lays the public and the authorities open to the charge of attempting to confiscate the property of the utility company. Now, we believe, without the slightest hesitation, that neither the commission nor the public, nor any community in this state, if left free to act, would, from greed or ignorance, ever desire to take the property of the utility without compensation. They

700          NEBRASKA REPORTS.          [Vol. 103

Omaha & C. B. Street R. Co. v. Nebraska State Railway Commission.

know that in the loss of these utilities the people would suffer most. The state must be careful to do nothing which may rightfully take away from it that valuable right of jurisdiction and control over its own local property and institutions.

While there was some evidence bearing upon the valuation of the utility, we agree with the commission that there was not sufficient upon which to base any permanent rate. The law contemplates that the findings and orders should be made in the first instance by the commission, which has powers of its own that the courts may not usurp. Its orders will not be reversed unless clearly wrong.

We are of opinion that the commission was right in ordering that a hearing be had for the purpose of taking evidence, with a view to fixing the valuation of the property for rate-making purposes, and that, pending such hearing, the commission should award such raise in fares as would make the company secure against possible insolvency; that such rates, so fixed, should be temporary, abiding only the investigation ordered. Apparently, a rate of 6 cents for a single ticket and 10 tickets for 55 cents would not be improper, but the exact rate is for the commission to order.

Public service corporations naturally keep in view the value of the service to the user and what charge the traffic will bear. The public (and the courts, too) inquire: What has been the cost of the service to the utility? Capital can be attracted to these enterprises only as there is confi⌐ nce that fair returns, under reasonably capable management, will be allowed.

The profits of most business enterprises depend largely upon the amount of business done. This is peculiarly true of railroads and street railway companies. When the plant is ready for operation, the great cost of the service has been incurred. Additional cost, due to ever-increasing business, is insignificant compared with the increasing income. The public have always anticipated,

and may properly anticipate, decreasing rates as population and business increase. A fair wage must be paid to employees, and a fair return must be paid to those whose capital is invested.

Complaint is made by the plaintiff company of the attitude of the commissioners, or some of them, or their manner of conducting the hearing. We admit that it is a little startling to the lawyer, bred in the courts, who is submitting his controversy to a body having judicial powers, to see a member of that body conduct a cross-examination and hear him express opinion upon the merits before the case is finally submitted. Not only is impartiality the supreme virtue of courts as ministers of the law, but the courts have always recognized that their functions can be best exercised and protected under conditions which exclude any invasion of the partisan or personal element, or the appearance of it. Accordingly, they have been hedged about by forms and rules calculated to inspire the greatest respect for the position the judge occupies. That which may appear to be anomalous inheres more or less in the nature of the proceeding and the unusual powers vested in the state railway commission. The division of the powers of the state into legislative, executive, and judicial is natural. Aristotle pointed out long ago the difficulties and dangers of lodging law-making powers in the executive department of government. Courts, as such, know only adversary parties, and are unsuited to the work of commissions.

The state railway commission is clothed with certain legislative, judicial, and administrative powers, but a review of its action is reserved to the courts. In the exercise of its legislative and administrative powers, it must be that it exercise those functions, and hence conduct for itself those investigations which will enable it to legislate wisely. It must be permitted to see to it that the evidence necessary is adduced, and to take the legislator's attitude as to what the law should be. The commission,

702 NEBRASKA REPORTS. [Vol. 103

Omaha & C. B. Street R. Co. v. Nebraska State Railway Commission.

as a co-ordinate department of the state, acts independently. In the exercise of its prerogatives, it is not subject to dictation or criticism by the courts, except as what transpires may be a proper subject of review, as bearing upon the orders or judgments of the commission. The courts, ordinarily, in reviewing the work of arbitration boards and commissions, give ready attention to any complaint on the part of either of the parties that the body hearing the matter was actuated by any feeling of bias or prejudice, or other improper motive. The commission is free to adopt its own rules and course of procedure, and to do everything necessary to inspire and bring about absolute respect for it and its judgments. It may preserve decorum, and under some circumstances may punish for contempt. Being, in fact, neutral as between the parties, and conducting its hearings, not *ex parte*, nor as a partisan debate between it and either of the parties, it may avoid all appearance of bias or prejudice. Upon review of the record in this case, we find nothing to indicate that the commission has been actuated by any desire other than to do justice to the utility, on the one hand, and the public, on the other.

Defendant city of Omaha raises the issue whether jurisdiction for determining rates is not, by law, vested in the city council of Omaha. A part only of the plaintiff's lines are within the limits of the city of Omaha. The act, known as the "Railway Commission Act" (Laws 1907, ch. 90, Rev. St. 1913, sections 6104-6158), gives exclusive original jurisdiction of cases, like this, involving the rates of common carriers, to the state railway commission, and, although there is a provision in the Omaha charter which appears to be to the contrary, we are of opinion that the act is unamended and unchanged, so as to deprive the state railway commission of jurisdiction in this case.

The order of the state railway commission, denying any increase of rates, is reversed, and the cause remanded to the commission, with instructions to order an increase of

rates, the same to be temporary only and continue until such time as is necessary after an investigation and hearing before the commission to determine what rate is right and proper under the facts of the case.

REVERSED.

MORRISSEY, C. J., not sitting.