STATE ex rel. LACLEDE GAS CO.,
Relator-Appellant,

v.

PUBLIC SERVICE COMMISSION of
Missouri, Respondent,

and

AFC Industries, Incorporated, et
al., Intervenors.

No. KCD 27958.

Missouri Court of Appeals,
Kansas City District.

March 29, 1976.

Richard L. Eckhart, St. Louis, for relator-appellant.

Leland B. Curtis, Paul W. Phillips, Jefferson City, for respondent Public Service Commission of Mo.

Robert G. Brady, Robert C. Johnson, Lawrence R. Ehrhard, St. Louis, for Industrial Intervenors.

Stanley P. Christopher, Russell D. Jacobson, Jeremiah D. Finnegan, Kansas City, for amicus curiae Jackson County, Mo.

Arthur J. Doyle, Kansas City, for amicus curiae Kansas City Power & Light Co.

L. T. McSpadden, Blytheville, Ark., for amicus curiae Arkansas-Missouri Power Co.

Jack L. Oliver, Cape Girardeau, for amicus curiae Mo. Utilities Co.

Judith P. Rea, Kansas City, for amicus curiae Mo. Public Service Co.

Stewart W. Smith, Jr., St. Louis, for amicus curiae Union Elec. Co.

J. Steve Weber, Jeffersn City, for amicus curiae Mo. Edison Co. and Mo. Power & Light Co.

Charles S. Wilcox, St. Joseph, for amicus curiae St. Joseph Light & Power Co.

Before DIXON, P. J., PRITCHARD, C. J., and WASSERSTROM, J.

WASSERSTROM, Judge.

The question here for decision is whether Laclede Gas Company should have been granted an interim rate increase by the Public Service Commission of Missouri pending determination by that Commission of whether a permanent rate increase should be allowed. This problem comes before a Missouri appellate court now for the first time.

On February 1, 1974, Laclede filed its application No. 18015 before the Commission for an increase in rates calculated to produce an additional $12,475,000 in additional revenue. This application and the proceedings thereon is referred to as the "permanent" rate case.

On February 15, 1974, Laclede filed a second proceeding, entitled "Application for Partial Increase after Hearing," which was given the separate number No. 18021 and is referred to as the "interim" rate case. This latter application sought to increase revenues by $5,440,000 during the interim peri-

od until action by the Commission in the permanent rate case. Laclede alleged that the interim increase had become necessary because it could no longer earn a fair return on the fair value of its property because of inflationary cost increases and because of a precipitous decline in revenue resulting from the national fuel conservation program. Applications were filed with the Commission by a number of public bodies and industries (including the "Industrial Intervenors" who have appeared in this court) to intervene in the interim proceeding, which applications were all granted.

A one day hearing was held by the Commission on March 21, 1974, at which time Laclede offered testimony and statistical documents to sustain the allegations of its petition. In very brief summary, its evidence was that since 1969 when its rates had last been set by the Commission, Laclede had suffered a decline in rate of return on total invested capital and in the return on its common equity; that the costs of all types of financing had increased substantially with the result that the imbedded cost of the company's debt had increased and would increase further; that because of inflationary increase in costs there was a net decrease in operating income; that because of conservation measures there had resulted a substantial load loss in therm use per customer; that earnings per share of $2.46 in the fiscal year of 1973 had dropped to $2.14 per share by the end of the calendar year 1973, and absent rate relief was projected to fall in fiscal 1974 to approximately $1.67 to $1.70 per share; that Laclede stock had fallen in value and had been selling below book value for about a year; that interest coverage on the company bonds had fallen. However, Laclede's president admitted in his testimony that Laclede was able to arrange debt financing; that even if interim relief was not granted, Laclede would not become insolvent, be unable to serve its present customers, or be unable to pay dividends; further, that it had not been necessary for Laclede to reduce salaries or terminate any personnel; and the failure of the Commission to grant interim relief would not affect the credit

rating of Laclede bonds. A staff accountant of the Commission testified that he had made a summary review of the Laclede application and exhibits and found nothing materially wrong with them as presented; no audit had been conducted by the Commission staff which had relied entirely upon the figures provided by the company.

On May 2, 1974, the Commission issued an order denying the interim rate increase by a 3 to 2 vote. Laclede filed a motion for rehearing which was overruled and then filed petition for review in the circuit court of Cole County under the provisions of § 386.510. (All statutory references herein being to RSMo 1969.) While that proceeding was pending in the circuit court, the Commission on August 22, 1974, issued its order in the permanent rate case granting Laclede a rate increase in the amount of $11,350,000.

On December 30, 1974, the Circuit Court of Cole County entered its judgment affirming the decision of the Commission on the grounds that the Commission action was a proper exercise of its discretion and also on the basis that the Commission's order in the permanent rate case had rendered the interim rate proceeding moot.

Laclede thereupon filed notice of appeal to the Missouri Supreme Court, setting forth in its Notice of Appeal that the Commission's order constituted a confiscation of Laclede's property in violation of its constitutional rights. On April 14, 1975, the Supreme Court ordered the transfer of the appeal to this court "in which jurisdiction is vested."

## I.

■ The Commission, the industrial intervenors and amicus curiae Jackson County all join in urging that this appeal be dismissed on the simple ground that the case has become moot. They argue that the permanent rate increase has already been granted by the Commission, that the permanent increase includes the relief sought by way of interim increase, that under the law the increase cannot be made retroactive

to the interim period, February 15 to August 22, 1974, and that since no relief can be granted, it is a futile exercise for this court to retain jurisdiction. They cite in support *State ex rel. Capital City Water Co. v. Public Service Commission,* 298 Mo. 524, 252 S.W. 446 (banc 1923).

Nevertheless, even though relief may no longer be available to Laclede by means of this proceeding, still the question here presented is a recurring one of great public concern. This is evidenced by the considerable number of interventions before the Commission in this court and the appearances in this court as amici curiae. Among the parties so appearing as amici are seven electrical utility companies, who point out that the problem raised herein by Laclede (which is a gas utility) also extends with like force to the electric utilities of this state, as evidenced by the "Union Electric order" issued by the Commission on March 29, 1974, in case No. 17965, denying interim relief. See also *State ex rel. Gas Service Co. v. Public Service Commission,* Mo.App. 536 S.W.2d 491, No. KCD27987, being decided concurrently herewith.

In its very nature, an interim rate request is merely ancillary to a permanent rate request, and in overwhelming probability the permanent rate request will have been granted before any denial of an interim increase can work its way to the point of decision by an appellate court. If the important legal propositions presented by this appeal are to be decided at the appellate level at all, it is apparent that jurisdiction for that purpose must be exercised despite the technical point of mootness. Because of these considerations, this case should be retained and decided. *In re Marshall,* 478 S.W.2d 1, 5 (Mo. banc 1972); *O__ H__ v. French,* 504 S.W.2d 269 (Mo.App.1973); *Lawyers' Association of St. Louis v. City of St. Louis,* 294 S.W.2d 676 (Mo.App.1956).

## II.

Logical order calls for consideration next of the contention by amicus curiae Jackson County that the Commission has no power to grant interim rate increases. If this contention be sound, then it would become unnecessary to consider anything further. However, the County's argument is not well founded.

The County argues that the Commission has only those powers specifically or necessarily by implication conferred upon it by statute, that there is no statute in this state granting the Commission power to grant interim rate increases, and that in the absence of such a statutory grant there can be no such authority. In support of its argument, the County has collated a list of many states granting this power of interim relief by special statutory provision, and the County argues that if the Missouri Legislature had intended the Commission to have this power, then the Missouri Legislature would have so provided as have the legislatures of other states.

The Commission, on the other hand, argues that its power to grant interim rate relief must be inferred from the provisions of Sections 393.140(11) and 393.150. The first of those sections provides that every gas utility may file with the Commission rates to be charged and that:

"Unless the commission otherwise orders, no change shall be made in any rate or charge * * * except after thirty days' notice to the commission and publication for thirty days as required by order of the commission, which shall plainly state the changes proposed to be made in the schedule then in force and the time when the change will go into effect. The commission for good cause shown may allow changes without requiring the thirty days' notice under such conditions as it may prescribe. . . ."

Section 393.150 provides that whenever a gas corporation shall file a new rate or change with the commission:

"[T]he commission shall have, and it is hereby given, authority * * * to enter upon a hearing concerning the propriety of such rate * * * and pending such hearing and the decision thereon, the commission upon filing with such schedule, and delivering to the gas corporation * * * affected thereby, a

statement in writing of its reasons for such suspension, may suspend the operation of such schedule and defer the use of such rate, \* \* \* but not for a longer period than one hundred and twenty days beyond the time when such rate \* \* \* would otherwise go into effect; and after full hearing, whether completed before or after the rate \* \* \* goes into effect, the commission may make such order in reference to such rate \* \* \* as would be proper in a proceeding initiated after the rate \* \* \* had become effective.

"2. If any such hearing cannot be concluded within the period of suspension, as above stated, the commission may, in its discretion, extend the time of suspension for a further period not exceeding six months. At any hearing involving a rate sought to be increased, the burden of proof to show that the increased rate or proposed increased rate is just and reasonable shall be upon the gas corporation \* \* \*."

The Commission points out that in 1949 in reliance upon the quoted statutory provisions it adopted a rule in *Re Southwestern Bell Tel. Co.,* 2 Mo.P.S.C.(N.S.) 131, under which it can and has granted special interim relief in emergency situations.

▇▇▇▇ The "file and suspend" provisions of the statutory sections quoted above lead inexorably to the conclusion that the Commission does have discretionary power to allow new rates to go into effect immediately or on a date sooner than that required for a full hearing as to what will constitute a fair and reasonable permanent rate. This indeed is the intended purpose of the file and suspend procedure. Simply by non-action, the Commission can permit a requested rate to go into effect. Since no standard is specified to control the Commission in whether or not to order a suspension, the determination as to whether or not to do so necessarily rests in its sound discretion.

The ravaging inflation of the past few years has demonstrated the practical need for this power. A striking example of the necessity for granting this type of emergency relief to a utility was demonstrated in *Sho-Me Power Corp.,* Case No. 17,381 (1972), in which the Commission allowed an interim rate increase where the applicant was operating at a loss of over $70,000 per month and where it had paid no dividends for a period of five years. So also in the *Missouri Power & Light Co.* case, No. 17,815 (1973), the Commission found it appropriate to grant an interim rate increase to halt a deteriorating financial situation which "constituted a threat to the company's ability to render adequate service."

The very real necessity of recognizing such a power in the regulatory agency has long been recognized by courts throughout the country. Not a single case has been cited by Jackson County nor found by independent research which has ever denied such a power to a regulatory agency such as the Missouri Public Service Commission. On the other hand, numerous cases from diverse jurisdictions have recognized and given effect to such an implied power even in the absence of specific statutory authority: *Omaha & C. B. St. Ry. Co. v. Nebraska State Railway Commission,* 103 Neb. 695, 173 N.W. 690 (1919) (decided prior to the present Nebraska statute expressly authorizing temporary increases in an emergency); *Muskogee Gas & Electric Co. v. State,* 81 Okl. 176, 186 P. 730 (1920), *City of Bartlesville v. Corporation Commission,* 82 Okl. 160, 199 P. 396 (1921), and *Oklahoma Gas & Electric Co. v. State Corporation Commission,* 83 Okl. 281, 201 P. 505 (1921) (decided in the absence of any statute granting express power to make interim increases); *State ex rel. Puget Sound Navigation Co. v. Department of Transportation of Washington,* 33 Wash.2d 448, 206 P.2d 456 (banc 1949) (without reliance upon any specific statutory power); *Chesapeake & Potomac Tel. Co. v. Public Service Commission,* 330 A.2d 236 (D.C.App.1974) (authority found solely by implication); *City of New York v. New York Telephone Co.,* 115 Misc. 262, 189 N.Y.S. 701 (1921) (decided before the adoption of the present New York statute specifically authorizing temporary increases); *State ex rel. Utilities Commission v. Morgan,* 16 N.C.App. 445, 192 S.E.2d 842 (1972) and *State ex rel. Utilities Commis-*

*sion v. Edmisten,* 26 N.C.App. 662, 217 S.E.2d 201 (1975) (decided under a file and suspend statute substantially similar to that of Missouri and with no provision expressly permitting temporary rates); *Southern Bell Telephone & Telegraph Co. v. Bevis,* 279 So.2d 285 (Fla.1973) (decided before adoption of the present Florida statute specifically authorizing interim increases); *Federal Power Commission v. Tennessee Gas Transmission Co.,* 371 U.S. 145, 150, 83 S.Ct. 211, 9 L.Ed.2d 199 (1962).[1]

■ Amicus curiae Jackson County calls attention to the fact that at the current session of the Missouri Legislature, Senate Bill No. 530 has been introduced for the purpose of empowering the Public Service Commission to "prescribe temporary schedules, rates, tolls, charges, or joint rates to be charged and collected" by a public utility pending the hearing and final determination of a permanent increase. While the amendment to a statute must be deemed to have been intended to accomplish some purpose, that purpose can be clarification rather than a change of existing law. *Hogan v. Kansas City,* 516 S.W.2d 805, l.c. 811 (Mo.App.1974). Moreover, the largest portion of that pending bill pertains to the creation of a procedure under which the utility applying for interim rate relief would be required to furnish a specified bond and further specifying the procedure under which customers of the utility would be entitled to refunds in the event the increases temporarily allowed were ultimately found to be excessive. In view of the considerations and authorities discussed above, we conclude that Senate Bill No. 530 is intended only to clarify and particularize existing law.

■ Amicus Jackson County also objects to placing a judicial stamp of approval on the power to grant interim increases, on the

ground that this would ignore the lack of statutory provision for notice and other procedural safeguards to consumers. Jackson County argues that this will deprive customers of constitutional due process and equal protection of the law. The identical argument directed against the file and suspend procedure was rejected in *State ex rel. Jackson County v. Public Service Commission,* 532 S.W.2d 20, 31 (Mo. banc 1976).

■ We hold that the Commission has power in a proper case to grant interim rate increases within the broad discretion implied from the Missouri file and suspend statutes and from the practical requirements of utility regulation.

### III.

Laclede resists the foregoing analysis and challenges the conclusion of the trial court that "[t]he exercise of the Commission's discretionary power over the suspension of rates filed with it, is a matter of administrative discretion * * *." Laclede concedes that this would have been a discretionary matter had the application in this case been filed under the file and suspend procedure prescribed in §§ 393.140 and 393.-150. However, Laclede denies that its application in this case was under those file and suspend provisions. Its contention is that § 393.150 comes into play only if there is first a "filing" under § 393.140(11). It goes on to say that (although the requested rates were attached to its application as filed with the Commission) those rates were not then "filed," but rather Laclede merely asked for a hearing and authority to *thereafter* file its proposed rates. Laclede points to no statute underpinning the procedure which it purports to have followed and which it claims to be different from that prescribed by §§ 393.140 and 393.150.

---

1. A somewhat analogous question is whether the Commission has authority to grant interim test or experimental rates. The Missouri Supreme Court has long held that the Commission does have this power as a matter of necessary implication from practical necessity. *State ex rel. Watts Engineering Co. v. Public Service Commission,* 269 Mo. 525, 191 S.W. 412 (banc 1917); *State ex rel. Washington University v. Public Service Commission,* 308 Mo. 328, 272 S.W. 971 (banc 1925); *State ex rel. City of St. Louis v. Public Service Commission,* 317 Mo. 815, 296 S.W. 790 (banc 1927); *State ex rel. McKittrick v. Missouri Public Service Commission,* 352 Mo. 29, 175 S.W.2d 857 (banc 1943).

■ The Missouri Supreme Court has recently affirmed the validity of the file and suspend procedure set forth by these statutory sections, in *State ex rel. Jackson County v. Public Service Commission*, 532 S.W.2d 20 (Mo. banc 1975). Where as here the statutes prescribe a manner in which proceedings before a public utility commission are to be initiated, that procedure must be followed. 73 C.J.S. Public Utilities § 47, p. 1114; *State ex rel. Laundry, Inc., v. Public Service Commission*, 327 Mo. 93, 34 S.W.2d 37 (1931); *Florida Motor Lines Corporation v. Douglass*, 150 Fla. 1, 7 So.2d 843 (banc 1942); *Southern Bell Telephone & Tel. Co. v. City of Louisville*, 265 Ky. 286, 96 S.W.2d 695 (1936); *City of Pittsburgh v. Pennsylvania Public Utility Com'n.*, 157 Pa. Super. 595, 43 A.2d 348 (1945).

■ The Commission and the trial court treated this case on the assumption that Laclede was proceeding within the general scope of the file and suspend procedures provided by §§ 393.140 and 393.150.[2] This treatment was favorable to Laclede, since otherwise its entire proceeding for interim rate increase in this case would have been of very doubtful effectiveness.

■ Even if we were to assume arguendo that Laclede could and did elect some variant procedure separate from that specifically specified by the statutes, that still would not enable it to escape from the existence of a wide discretion on the part of the Commission. The Public Service Commission itself confers a large area of discretion to the Commission in the exercise of its powers. § 386.430 and § 386.270. This primary discretion has been liberally recognized by the courts. See for example *State ex rel. Chi. R.I. & P. Rr. Co. v. Public Service Commission*, 312 S.W.2d 791 (Mo. banc 1958); *State ex rel. Kansas City Transit, Inc. v. Public Service Commission*, 406 S.W.2d 5 (Mo. banc 1966); *State ex rel. Fee Fee Trunk Sewer, Inc., v. Public Service Com'n.*, 522 S.W.2d 67 (Mo.App.1975). In short, the Commission need not look to § 393.150 as a source for discretion. Rather it relied on that section as the source of its authority to grant any interim relief. Once that authority was found, ample basis for discretion in the exercise thereof exists wholly apart from § 393.150.

IV.

All of the distracting preliminary issues now having been cleared away, there are finally laid bare the real, substantive issues in this case: (1) What is the proper test to be applied for the allowance of an interim rate increase? (2) Has Laclede proved facts bringing this case within the appropriate test?

A majority of the Commission follows the principle that the purpose of a special hearing concerning interim rates is to ascertain whether emergency conditions exist which call for especially speedy relief, and the Report and Order expresses the view that an interim increase should be granted only "where a showing has been made that the rate of return being earned is so unreasonably low as to show such a deteriorating financial condition that would impair a utility's ability to render adequate service or render it unable to maintain its financial

**2.** The Commission in its brief explains the theory upon which it processed the application for interim relief, as follows: "Appellant had filed rates (Commission No. 18,015) which had been suspended. Appellant was doing nothing more in the case at bar (Commission Case 18,021) than to persuade the Commission to in affect [sic] lift the suspension to the extent of granting an increase of $5,440,000." The North Carolina Commission adopted a like interpretation of that state's file and suspend statute, and was sustained in *State ex rel. Utilities Com'n. v. Morgan*, supra. The court held that the Commission did not exhaust its powers by suspending the filed rate, and was not precluded from thereafter withdrawing or modifying the suspension. Similarly, *City of Pittsburgh v. Pennsylvania Public Utility Com'n.*, 178 Pa.Super. 368, 115 A.2d 858 (1955) holds that the statutory power to suspend rates carries the implied power to revoke the suspension. Reflecting the same basic concept of the ancillary nature of the application for an interim rate increase, *South Central Bell Tel. Co. v. Louisiana Public Service Com'n.*, 272 So.2d 667 (La.1973) affirmed the action of the Commission in consolidating an application for an interim increase with a pending application for a permanent increase.

integrity." Laclede admits that if this be the proper test to be applied, then the ruling in this case must be against it. As it states in its brief, "Appellant has not and does not now contend that Respondent's order would not be based on competent and substantial evidence if the interim rate tests applied by Respondent and the lower Court are the tests lawfully to be applied to interim rates. . . ."

However, Laclede strenuously contests the propriety of the Commission's test. It contends that the Commission has a broader duty than merely to grant interim increases in the case of emergency. Laclede insists that the Commission must also grant such relief in any case where necessary to afford the utility a fair and reasonable return upon its invested capital, and it argues that under the facts proved its existing approved rates are so unreasonably low as to be confiscatory.

◼ In support of the test urged by it, Laclede argues that a duty to set rates sufficient to furnish a fair and reasonable return is imposed upon the Commission by both statutory and constitutional provisions. With respect to the alleged statutory duty, Laclede points to § 393.140(5) which provides that, "[w]henever the commission shall be of the opinion, after a hearing had upon its own motion or upon complaint, that the rates or charges or the acts or regulations of any such persons or corporations are unjust, unreasonable, unjustly discriminatory or unduly preferential or in anywise in violation of any provision of law, the commission shall determine and prescribe the just and reasonable rates and charges thereafter to be in force for the service to be furnished, *notwithstanding that a higher rate or charge has heretofore been authorized by statute * * *"* (emphasis added). The quoted provision, properly interpreted, appears to refer to a proceeding *against* a utility having for its purpose a *reduction* of rates. This is particu-

larly inferable from the last phrase in the above quotation. In any event, it would be unreasonable to construe this statutory section as imposing a duty upon the Commission to set "just and reasonable rates" in a special hearing for the limited purpose of considering an interim increase, since the setting of fair rates is the purpose and subject of the full rate hearing. To construe § 393.140(5) as applicable here would make the hearing on interim rates coextensive with that on the permanent rates and would therefore in practical effect make accelerated action on interim rates impossible.

◼ Turning now to Laclede's constitutional argument, it contends that the due process clauses of the United States and Missouri constitutions and the prohibition in the Missouri constitution against taking property without just compensation join in requiring that the test to be applied in any rate hearing (whether for permanent or interim increases) be that the rates be sufficient to produce a fair return on the property invested. Every utility does have an undoubted constitutional right to such a fair and reasonable return, and this is a continuing right which does not cease after beginning rates are initially determined. *Bluefield Waterworks & I. Co. v. Public Service Commission*, 262 U.S. 679, 43 S.Ct. 675, 67 L.Ed. 1176 (1923); *State of Missouri v. Public Service Commission,* 262 U.S. 276, 43 S.Ct. 544, 67 L.Ed. 981 (1923); *In re Permian Basin Area Rate Cases*, 390 U.S. 747, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968). The Commission does not challenge this rule. While it did speak in its Report and Order of an interim increase being permissible "only" pursuant to its emergency test, it does not repeat that broad claim in this Court. Instead, it limits its response to Laclede's constitutional argument to the narrow proposition that Laclede has failed to carry its burden of proving facts amounting to confiscation.[3]

---

**3.** The Supreme Court order transferring this appeal to this Court should be understood in this light. While the question remains whether Laclede's rates have become unreasonable, that

is a matter of constitutional *application*, not constitutional *construction*, and therefore falls within the jurisdiction of this Court.

However, whether the rates in effect at any given time are just and reasonable depends upon many facts and can only be determined after rather extended investigation and study. Thus, for example, the Missouri statute provides in § 393.-270(4) that "[i]n determining the price to be charged for gas * * * the commission may consider all facts which in its judgment have any bearing upon a proper determination of the question * * * with due regard, among other things, to a reasonable average return upon capital actually expended and to the necessity of making reservations out of income for surplus and contingencies." Because of the necessity to make these investigations, hold hearings and permit arguments with respect thereto, the proceedings before regulatory bodies for rate increases inevitably entail considerable time and have led to delay in the granting of increases which is generally referred to as "regulatory lag." While this delay is regrettable, the courts have recognized that some lag is unavoidable and have generally held that no deprivation of constitutional rights occur because of suspension of the proposed increase pending a hearing thereon, provided the delay for purposes of such hearing is not unreasonably long. Representative cases so holding are *Hope Natural Gas Co. v. Federal Power Commission,* 196 F.2d 803, 808 (4th Cir. 1952); *Mountain States T. & T. Co. v. Public Utility Commission of Colorado,* 345 F.Supp. 80 (D.C.Colo.1972); *New Rochelle Water Co. v. Public Service Commission,* 31 N.Y.2d 397, 340 N.Y.S.2d 617, 292 N.E.2d 767 (1972); *Cumberland Tel. & Tel. Co. v. Railroad and Public Utility Commission,* 287 F. ·406, 417 (D.C.Tenn.1921).

Laclede does not challenge that doctrine and refers to regulatory lag only to a limited extent by way of background. As its principal argument to show that its present rates have become unjust, Laclede relies principally upon a mathematical computation showing that its income during the test year 1973 and as projected for 1974 will fail to produce the rate of return on invested capital which was allowed to it by the last rate order issued by the Commission in 1969. In this respect, Laclede points out that the Commission's staff evidence showed that Laclede for the calendar year 1973 earned a rate of return of 7.20%. Laclede then compares that rate of return to those which were produced from the rates approved by the Commission in 1969, under which Laclede would receive a rate found to be approximately 7.76% under the staff figures and 7.36% applying the company's figures. Referring then to a finding in the 1969 order that "this is not an unreasonable range," Laclede argues that its 1973 return of only 7.20% must necessarily be deemed below the reasonable range. This argument is one which the two dissenting commissioners found persuasive and which is emphasized in the dissenting opinion of Commissioner Clark.

This same basic argument has been presented to a number of courts through the country and the judicial reaction has been divergent. However, the majority and better view rejects the argument that any return less than the rate previously set must be deemed prima facie unreasonable. Thus in *Mountain States T. & T. Co. v. Public Utility Commission of Colorado,* supra at p. 85, a majority of a three-judge federal court rejected an argument similar to that of Laclede in the present case, holding as follows:

> "Mountain Bell assumes that the figure 8.9 percent is an absolute and that the slightest departure from this level of return—even an infinitesimal fraction of a percentage point—is *per se* confiscatory and unconstitutional. But the cases do not support the company in this assertion. Rather the decisions recognize that the regulatory agency has some flexibility in fixing the rate of return—its decision being subject to existing economic conditions. . . .

> \* \* \* \* \* \*

> "The cases also recognize that the fixing of rates is a matter largely of prophecy and because of this commissions in carrying out their functions necessarily deal in what are called 'zones of reasona-

bleness' the result of which is that they have some latitude in exercising this most difficult function. . . .

\* \* \* \* \* \*

"As we view it then, for us to find that the present rate results in confiscation of the company's private property, we would have to make a finding based on evidence that the present rate is outside of the zone of reasonableness, and that its effects would be such that within the upcoming two months, until the Commission acts, the company would suffer financial disarray. Nothing bordering on this is apparent and it is doubtful whether it will come about. Thus, we would be unable to find a state of confiscation. There is not the slightest indication in the decisions that confiscation is to be adjudged on any instant basis."

So also in *South Central Bell Tel. Co. v. Louisiana Public Service Commission,* 272 So.2d 667 (La.1973), the majority of the court rejected an argument very much like the one presented by Laclede here. In the Louisiana case the utility filed on December 17, 1971, for a 9.5% permanent rate of return. Then on December 29, 1971, it filed for an interim increase to enable it to reach 7.925% which was the rate previously allowed by the commission in July, 1971. A majority of the court characterized this as a "make whole" petition and rejected the argument that the denial by the commission of the requested immediate increase constituted an unconstitutional confiscation. In this connection the majority opinion stated:

"'We need not, indeed we cannot, determine what are valid permanent rates and charges. We can determine only whether a continued imposition of present tariffs would constitute confiscation of the Company's property. Although, it may be that the Company should receive a higher rate of return on its investment and is entitled to have the Commission fix rates and charges which will produce such a return, the record does not justify a finding that the present rate of return is so inadequate as to be confiscatory. . . .

"'We reiterate: We are not here concerned with a determination of reasonable telephone rates and charges or with a valid yield of return on the Company's investment for its operations. We pass only upon the question of whether the Commission's action or inaction amounts to a constitutional violation—that is, confiscation of the Company's property. We hold that the Company has failed to establish that the Commission's enforcement of present rates is tantamount to confiscation.

"In the present case, South Central Bell concedes that it realized a rate of return of 7.40 per cent in 1971. For 1972, the projected rate of return is 6.33 per cent. We likewise hold that these rates are non-confiscatory. We, of course, express no opinion as to the merits of the pending petition for a rate increase.

"The Louisiana Public Service Commission now has the general rate case under advisement. The entire telephone rate structure, including the matters raised in the present case, are under review. We find no adquate [sic] reason for disturbing the orderly procedures of the Louisiana Public Service Commission, as it discharges its constitutional duty of regulating utility rates in Louisiana."

To the same general effect is *State ex rel. Utilities Commission v. Duke Power Co.,* 285 N.C. 377, 206 S.E.2d 269, 281 (1974), where it was held that a prior regulatory finding of 8% as a proper rate of return on equity was not res adjudicata as to what constituted a proper rate of return for those dates and did not bar the Commission from setting a lower rate at a later date despite a continued rise of inflation.

The foregoing cases reflect the same general approach which was adopted by the Missouri Supreme Court in *State ex rel. Capital City Water Co. v. Public Service Commission,* 298 Mo. 524, 252 S.W. 446, 456 (banc 1923). In that case the court refused to disturb a test rate set by the Commission even though the company's earnings were projected to produce less than the previously approved rate of 8½%. In this connec-

tion the court held that "[t]he law, of course, did not require that the rates at any time yield any particular return." The court further pointed out that 8½% might be right in 1918, "but it does not follow that rates which might yield a slightly lesser sum during the 13 months from November 1, 1919, to November 1, 1920, would be confiscatory."

In opposition to the cases just cited, Laclede relies primarily on *State ex rel. Utilities Commission v. Morgan*, 16 N.C.App. 445, 192 S.E.2d 842 (1972) and *Southern Bell Telephone & Telegraph Co. v. Bevis*, 279 So.2d 285 (Fla.1973). The first of those cases is easily distinguished. In that North Carolina case, the utility filed for a 5.63% rate increase in May, 1971. The Commission first suspended the new rates pending final hearing, but later withdrew the suspension on June 30. In August the utility amended its application to seek an increase of 19.63%. After full hearings the Commission granted 14.38% in February. The Attorney General appealed the withdrawal of the original suspension of the 5.63% increase on the ground that the withdrawal was arbitrary and capricious. The court affirmed the Commission's order. This *Morgan* case stands for no more than an approval of action taken within the discretion of the Commission.

With respect to the *Bevis* case, decided by a divided court, the opinion probably reflects a judicial philosophy contrary to the view of the majority of the courts throughout the country. Nevertheless, this case also can be distinguished from the one at bar. In *Bevis*, the utility filed two applications, one for a permanent increase of $106,821,300, and the other for an interim increase of $32,795,000. A prior order of the Commission had set 8.25% as a minimum fair, just, reasonable and sufficient rate of return. The Florida Commission denied interim relief holding that the utility had shown no emergency. The majority opinion of the Florida court held that evidence of earnings at 6.78% and a projected rate of return of 5.96% made a prima facie case requiring an interim increase so long

as that increase did not produce a return in excess of the previously authorized 8.25% rate of return. The important difference between *Bevis* and the present case is that the Missouri Public Service Commission by its last previous order did not set any minimum rate of return. In order to give a proper understanding of this point, some explanation must be given of the nature of the rate order issued by the Commission to Laclede in 1969.

In the first place, it is important to emphasize that the order issued by the Commission on September 1, 1969, in case No. 16689, was not an adjudication of litigated issues, but rather it was entered pursuant to a stipulation and agreement of the parties. The underlying stipulation provided:

"This Stipulation is entered into and approved with the explicit understanding that it constitutes only a dollar settlement of Case No. 16,689, and neither the Company, the Commission's Staff, nor any other person or party shall be, for the purpose of other future proceedings, deemed to have approved, accepted, agreed on, or consented to any rate-making principle or any method of cost of service determination which has been used or supposedly used in arriving at this Stipulation."

The findings then made by the Commission must be read in the light of that Stipulation. The Commission did make a finding that the $4,550,000 rate increase which had been agreed upon would produce a certain calculated rate of return. This rate would vary depending on whether certain figures prepared by the Commission staff were used or whether the figures prepared by Laclede were used. Finding of Fact No. 4 stated that applying the staff exhibits the rate of return would calculate to 7.76% return, while if the Laclede figures were used, the rate of return would be 7.36%. Finding No. 4 then goes on: "[f]or the purposes of this case only, and based upon the Stipulation filed, the Commission finds this is not an unreasonable range."

It is readily apparent that the 1969 finding merely made arithmetical calculations

to arrive at two different figures and then said that neither of those figures would be unreasonable. That was far from saying that some other figure might not also be reasonable. Furthermore, the order itself, and especially when taken together with the accompanying Stipulation, made it crystal clear that nothing in the order was intended for anything beyond "the purposes of this case only." Further to this point are the following portions of the conclusions entered by the Commission as part of its August 25, 1969 order:

"ORDERED: 4. The Stipulation and Agreement filed herein is accepted and made effective recognizing the stated condition of the parties of record that no party is to be prejudiced in future proceedings by the methods or principles of determining the cost of service, rate of return, rate design, or rate structure utilized in or which may be reflected in this record, and that any finding as to the original cost rate base and as to rate of return shall not be binding upon the Commission or any party hereto as far as any future proceedings are concerned.

"ORDERED 5: This Order is without prejudice to any findings or Orders which have been or may be hereafter made by the Commission, and is without prejudice to any claims or contentions which may be made by the Commission, Laclede Gas Company, the Staff, or any other party to this proceeding, in any other proceeding now pending or hereafter instituted by or against Laclede Gas Company, or any other companies, persons, or parties affected by this Order."

■ Particularly in view of the nature of the 1969 rate order and the reservations specifically contained therein and which have been quoted above, Laclede simply cannot hold too closely to a contention that any variation from the 1969 rate of return must necessarily be unjust and unreasonable. Indeed, Laclede makes the following important concession in its reply brief that it, "would not take issue with a decision that proof of a lower rate of return, without more, would not automatically entitle a utility to an increased rate of return." By

making that concession, Laclede has abandoned the keystone of its position that the Commission acted arbitrarily and unreasonably. There remains only to review briefly the factors shown by the record which affirmatively support the Commission's declination to grant an interim increase and which amply show that declination to be at least reasonably debatable.

On the facts here, Laclede earned according to its books a return in 1973 of 7.20% which was only .16% below the 7.36% rate of return which the Commission found to be a reasonable rate in the 1969 proceeding. With reference to those earnings, Laclede stated in its 1973 report to its stockholders: "To our shareholders and employees: the company experienced record sales and earnings during 1973. Earnings were $2.64 per share compared to $2.12 in 1972." Moreover, Laclede was able to serve its customers, it had continued to pay dividends to its stockholders, its bond coverage continued to be in excess of the coverage required by its bond indentures, and it ran no risk of a lowering of its bond rating during the period of maximum suspension pending completion of the permanent rate hearing. An important part of the evidence submitted by Laclede in this interim rate proceeding pertained to what it described as a precipitous decline in gas usage due to the federal fuel conservation program. Yet Laclede's data in that regard was based upon a very limited five week experience. Because of the shortness of time afforded by this special interim rate proceeding, the Commission staff had been unable to audit either those figures or any of the other financial data and exhibits submitted by Laclede. On top of all this, Laclede's permanent rate application was also concurrently in progress and indeed the Commission's report in the permanent rate increase proceeding was issued on August 22, 1974, which was less than four months after the order in the interim rate case.

■ Under these facts, Laclede clearly failed to carry the heavy burden of proof imposed upon it by § 386.430 "to show by

**574**

clear and satisfactory evidence that the determination * * * or order of the commission complained of is unreasonable or unlawful . . . ." See also the authorities cited under Section III of this opinion pertaining to the wide discretion of the Commission, to which the courts will defer.

Laclede seemingly realizes the inconclusiveness of the proof offered by it in this interim rate proceeding, and it attempts to flesh out its proof by making reference to evidence submitted and findings made in the permanent rate proceeding, Case No. 18,015. Thus it points out in its reply brief that "the Commission in the permanent rate case, decided only a few months after the rejection of the interim rates, found a rate of return in excess of 8.7% to be just and reasonable." Rather than helping Laclede, this reference simply emphasizes the desirability of leaving the whole question of just and reasonable rate (unless imperative facts require to the contrary) to the permanent rate proceeding in which all the facts can be developed more deliberately with full opportunity for an auditing of financial figures and a mature consideration by the Commission of all factors and all interests.

 It may be theoretically possible even in a purposefully shortened interim rate hearing for the evidence to show beyond reasonable debate that the applicant's rate structure has become unjustly low, without any emergency as defined by the Commission having as yet resulted. Although some future applicant on some extraordinary fact situation may be able to succeed in so proving, Laclede has singularly failed in this case to carry the very heavy burden of proof necessary to do so.

Affirmed.

All concur.